Anne **ARCHBOLD**, by John D. Archbold,
Executor of the Estate of Anne
Archbold, Deceased

v.

The **UNITED STATES.**

No. 99–68.

United States Court of Claims.

July 14, 1971.

Nichols, J., filed opinion concurring in result.

Ellis W. Manning, Washington, D. C., attorney of record, for plaintiff. Wenchel, Schulman & Manning, Washington D. C., of counsel.

Mark Segal, Washington, D. C., with whom was Asst. Atty. Gen., Johnnie M. Walters, for defendant. Philip R. Miller

and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

OPINION

COLLINS, Judge.*

 This suit for refund of Federal income taxes presents a novel issue under section 170 of the Internal Revenue Code of 1954. Involved is the deductibility, as a charitable contribution, of legal fees paid by the taxpayer to a private law firm for the firm's services in opposing highway construction through land which the taxpayer had earlier given to the United States for park purposes. The parties stipulated the relevant facts before the trial commissioner, and the Government now asks the court to review the commissioner's adverse determination.

The plaintiff is executor of the estate of Anne Archbold, the taxpayer and original plaintiff herein.

On November 10, 1924, Anne Archbold donated to the United States a sizable tract of land located in the District of Columbia in what was then known as Foundry Branch Valley. The land was given to become "a part of the Park System of the District of Columbia" and, together with adjacent land donated about the same time by Charles C. Glover, became a major part of what is today known as Glover-Archbold Park. The taxpayer's gift was accepted, and the land, as intended, became a part of the park, parkway, and playground system of the District of Columbia, administered by the National Park Service, an agency of the Department of the Interior.

Since its inception, Glover-Archbold Park has had an insecure existence, its intactness threatened repeatedly by the

---

* The court reaches the same result as did Chief Commissioner Marion T. Bennett, upon whose opinion, findings of fact, and recommended conclusion of law the court has relied heavily.

designs of highway planners. As early as the 1940's the District of Columbia sponsored a plan to construct a highway through the park, but, perhaps due to the protests of Anne Archbold, Charles C. Glover, Jr. (a son of Charles C. Glover), and others, a final plan was never adopted.

After passage of the Federal-Aid Highway Act of 1956, 70 Stat. 374, ch. 462, a new crisis began to brew. A major highway plan was developed for the District of Columbia which called for the construction of a highway through the park which would consume approximately one-half of its total area. Anne Archbold retained the Washington, D. C., law firm of Douglas, Obear & Campbell to oppose such proposed use of the park. After a public hearing before the Commissioners of the District of Columbia, which concluded on January 7, 1958, and at which Mrs. Archbold was represented, the plan was altered so as to exclude the park. For its services in representing her, Mrs. Archbold, during 1958, paid Douglas, Obear & Campbell a fee of $10,000.

The proposal to construct a highway through the park was again revived early in 1959. On July 25, 1959, Anne Archbold filed suit in the United States District Court for the District of Columbia for the purposes of (a) enjoining the District of Columbia Commissioners and others from proceeding with the contemplated highway, and (b) obtaining a declaratory judgment to the effect that construction of such a highway would violate the terms of her gift. In denying the Commissioners' motions to dismiss and for summary judgment the court stated in part:

> The court is convinced that an actual controversy does exist here as to the authority of the defendants Seaton and Wirth to make park land available for the contemplated highway and as to the authority of the District Commissioners to convert such park land to highway use, that there are herein genuine issues of material fact, and that the court should

not grant any of the motions to dismiss or for summary judgment.

Archbold v. McLaughlin, 181 F.Supp. 175, 180 (D.D.C.1960). The case was later dismissed as moot, however, after passage of the so-called "Northwest Freeze" in 1960. The "Northwest Freeze" was a provision contained in the National Capital Transportation Act, 74 Stat. 537, 540, July 14, 1960, which prohibited the construction of any freeway or highway in certain areas of Northwest Washington west of 12th Street, N.W., before July 1, 1965. The land donated by Mrs. Archbold was in the "Northwest Freeze" area.

In 1960, Mrs. Archbold paid Douglas, Obear & Campbell $19,003.07 for services rendered from May 15, 1958, in opposing the threatened highway construction. In 1961, she paid the firm $6,500 for similar services from January 29, 1960, including services rendered in connection with prosecution of the district court action.

The other legal fee with which we are here concerned was paid by Mrs. Archbold in 1962. The fee, in the amount of $4,500, was paid to Douglas, Obear & Campbell for terminating the district court litigation and for opposing construction of the proposed Three Sisters Bridge across the Potomac River. The bridge plan called for placing an interchange at the southern extremity of Glover-Archbold Park and for construction of a highway running the length of the park.

In her return for the taxable year 1958, Mrs. Archbold claimed, as a charitable contribution under section 170 of the code, the $10,000 she had paid Douglas, Obear & Campbell as described above. She listed the fee as paid for " * * * services solely in connection with dedication of lands for public purposes, namely, Glover-Archbold Parkway, Washington, D. C., and for the preservation of that public park from encroachment * * *." The deduction was disallowed. Because of the disallowance taxpayer did not attempt to deduct the legal fees paid in 1960, 1961,

and 1962. Instead, she timely filed claims for refund for all four taxable years. When they were all disallowed in full, this suit followed. Plaintiff asks judgment in the amount of $35,262.70, plus interest.

Section 170 of the Code allows as a deduction any charitable contribution which is made within a given taxable year. Subsection (c) defines a charitable contribution, in pertinent part, as "a contribution or gift to or for the use of * * * the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes."

One matter should be disposed of at the outset. Most of the Government's arguments are premised upon its assertion that Mrs. Archbold's expenditures of legal fees were motivated, at least significantly, by self-interest, and that she was a primary beneficiary of Douglas, Obear & Campbell's success in forestalling highway construction through the park. This assertion is based on allegations of personal interest which the taxpayer made in her 1959 lawsuit[1] and on the fact that taxpayer's principal place of residence, Hillandale, was adjacent to the donated land. Suffice it to say that we regard the allegations in the taxpayer's petition in the district court as having been made for jurisdictional purposes and as having little, if any,

probative value for present purposes. Moreover, while it is established that Hillandale is adjacent to the donated land, there is nothing in the record to indicate whether the construction of a highway through the park would have detracted from the value of Hillandale or actually enhanced it. So, although the Government contends that the legal fees involved herein were not incurred "for exclusively public purposes" because they provided the taxpayer with extensive personal benefits, we must agree with the trial commissioner that:

> * * * The record, taken as a whole, does not support this contention. The taxpayer sought no personal benefit and none inured to her save that which would naturally flow to her as a member of the general public from the preservation of the Park from encroachment. * * *

The real question with which we are confronted here, in terms of the statute, is whether in this case there has been a contribution or gift "for the use of" the United States.[2]

It is, of course, well established that in order for a gift to be deductible under section 170 it need not be made directly to a qualified donee.[3] However, it must at least be made "for the use of" a qualified donee.

The Government urges that "for the use of" means "in trust for" and that

---

1. The stipulation of facts contains the following paragraph:

 "In her suit for an injunction, decedent alleged as reasons in support of her complaint that she sought only to assure the carrying out of the terms on which the land had been donated by her to the United States; that she owned property adjacent to Glover-Archbold Parkway and had a direct interest in seeing the terms of her gift carried out; that construction of the proposed highway would destroy the terrain of more than 50 percent of Glover-Archbold Park; that she was now the owner of the property within the bounds of a right-of-way, known as 'Arizona Avenue,' running through Parcel 29/1 of the District of Columbia; that the construction of the highway would have been a trespass on the property in the Arizona Avenue right-of-way which

the District of Columbia did not own or have the right to use; that it would have been violative of the terms of the trust dedication for park purposes made by decedent; that it would have been in violation of and trespass upon her rights to a portion of the Arizona Avenue right-of-way; and that it would have resulted in irreparable injury to the decedent, and in the wanton destruction of Glover-Archbold Parkway."

2. Plaintiff does not maintain that the taxpayer made a contribution or gift "to" the United States.

3. In this case a direct gift of the legal fees to the United States was hardly a feasible alternative in view of the fact that the Government was cooperating with the District of Columbia.

"[t]he test in each case is whether the organization [qualified donee] has full control of the donated funds, and discretion as to their use, so as to insure that they will be used to carry out its functions and purposes." Rev.Rul. 62–113, 1962–2 Cum.Bull. 10, 11. To the Government, control of the donation by the donee is essential. But the Government's position is belied by substantial authority, including the Treasury regulations themselves. The regulations provide that—

> * * * unreimbursed expenditures made incident to the rendition of services to an organization contributions to which are deductible may constitute a deductible contribution. For example, the cost of a uniform without general utility which is required to be worn in performing donated services is deductible. Similarly, out-of-pocket transportation expenses necessarily incurred in rendering donated services are deductible. * * * [Treas.Reg. § 1.170–2(a) (2) (1969).]

The donees in the examples given in the regulations have no control, in any sense, over the expenditures. Nevertheless, the Commissioner of Internal Revenue has determined that the expenditures are "for the use of" the donees. All that the regulations apparently require is that the expenditure be "incident" to the rendition of services to a qualified donee. Moreover, the Internal Revenue Service has ruled that nonreimbursed, out-of-pocket expenses directly attributable to the performance of voluntary services for a qualified donee are "for the use of" that donee. *See* Rev. Rul. 58–279, 1958–1 Cum.Bull. 145.

It should perhaps be noted that there is no comparable regulation respecting expenditures made incident to the donation of a deductible gift.[4] However, we do not take this omission to mean that the Commissioner would disallow a deduction for such expenditures. Rather, if a deduction is allowable for expenses incident to the performance of nondeductible services, it would seem to follow, a fortiori, that incidental expenditures in the making of a deductible gift would be deductible.

In Orr v. United States, 343 F.2d 553 (5th Cir. 1965), the court considered the deductibility of several expenses incurred by an individual in rendering services to the Methodist Church. In so doing it stated that in order for such expenses to meet the statutory test, "the charitable work must be the *cause* of the payments." *Id.* at 557 (emphasis supplied).

This case is made slightly thorny by the fact that elements of the executive branch of the Government were acting in concert with District of Columbia officials in seeking to use part of the park for highway purposes. Although the precise role of the Federal Government in the park controversy is not clear from the record, it is clear that the Secretary of the Interior and the Director of the National Park Service were named as defendants in the district court suit, and that in the suit they were represented by the Department of Justice. The executive branch is only one branch of the Government, however, and in the matter of accepting or rejecting charitable gifts to the United States we think it is not the primary branch. Under the Constitution, Congress has plenary power over the District of Columbia, *see* U.S.Const. art. I, § 8, as well as controlling authority over the "property belonging to the United States," U.S.Const. art. IV, § 3. With respect to gifts to the United States, Congress has the predominant voice (especially where the donation concerns the District of Columbia). It was the Congress which accepted Mrs. Archbold's gift of land initially, and we think it was Congress' voice which was the crucial voice vis-a-vis approval or disapproval of the donor's expenditures of legal fees to preserve her gift. Congress' only expression of senti-

4. Treas.Reg. § 1.170–2(a) (2) (1969) provides that "[n]o deduction is allowable for contribution of services."

ment on the matter of highway construction through Glover-Archbold Park is contained in the "Northwest Freeze," and for that reason we view the United States as having approved Mrs. Archbold's efforts and expenditures.

Nor do we think that the fact that incidental expenditures directly attributable to, and caused by, a charitable donation come some time after the donation necessarily disqualifies them under section 170. We can conceive of no valid reason, especially considering the policy underpinnings of section 170, for imposing a time limit on the deductibility of out-of-pocket expenses incurred incident to a charitable donation.

In this case there can be no doubt that taxpayer's expenditures of legal fees were caused by, and directly attributable to, attempts to destroy the intactness and much of the land area of the park. As such, we think the expenditures were incidental to the original gift and that they are deductible. *Cf.* Estate of Philip A. Carroll, 38 T.C. 868 (1962), *acquiesced in,* 1963–2 Cum.Bull. 4.

It ought to be said, too, that the rule of this case need not go beyond donors attempting to preserve and implement their gift, or the purposes for which they made it. The giver of property for a particular purpose enjoys a continuing relationship to his gift which others do not have. To allow such a donor to obtain a charitable deduction for efforts to preserve the integrity of the gift (if acquiesced in by the donee) is not the same as allowing the public-at-large to secure deductions (for example) for legal attempts to improve the environment or to maintain public lands free of encroachment. Since the latter type of case implicates additional factors, it is not, and should not be, decided by this one.

For the foregoing reasons, plaintiff is entitled to recover, judgment is entered for plaintiff, and the case is returned to the trial commissioner for a determination of the amount of recovery under Rule 131(c).

NICHOLS, Judge (concurring):

I concur in the result. I deem it futile and irrelevant to ask whether the donee "accepted" the legal services here involved. If it is done at all, to do the job right we should inquire whether the donee "accepted" the services rendered under each of several bills, in different tribunals, including appearances in court, before the D. C. Commissioners, and apparently, lobbying in Congress. Rather, I would hold, if donor has made, and donee has accepted, an unquestionable charitable donation, donor has a right to further deductions for any subsequent ancillary expenses deemed necessary to prevent donee from diverting the gift to purposes other than those donor intended, and this is true whether donee is a public body or a private charity.