TRAVIS SMITH AND ESTHER J. SMITH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3803-72. Filed September 26, 1973.

*John A. Nehrer,* for the petitioners.
*John P. Graham,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes for 1967 and 1968 in the respective amounts of $713.81 and $608.39. The issue is whether out-of-pocket expenses incurred by petitioners, while doing evangelistic work in Canada in 1967 and 1968 on behalf of their church and religious faith, are allowable as charitable contribution deductions under section 170.[1]

FINDINGS OF FACT

At the time this proceeding was commenced, petitioners Travis Smith and Esther J. Smith were legal residents of Peninsula, Ohio. They filed joint Federal income tax returns for 1967 and 1968 with the district director of internal revenue for the Northern District of Ohio. "Petitioner" will refer to Travis Smith individually.

Petitioners belong to and attend a nondenominational company of Christians called an "assembly" at Cuyahoga Falls, Ohio. In statistical reports this church organization is listed as a branch of the Plymouth Brethren. The assembly, incorporated as a church under the nonprofit charitable organization laws of the State of Ohio, has approximately 60 members. All the males who take communion are called brothers, and the adult male members who are willing to preach are considered by the assembly to be ministers. Children who have not yet received communion are not considered members of the assembly, and women—although members—do not become ministers or preachers. The organization has no ordained or paid ministers, as such, and no titled officials, such as elders or deacons.

The assembly is fundamentalist in its religious beliefs. It places a heavy emphasis on evangelism. Its evangelistic work is accomplished abroad by contributions of the assembly members for the support of full-time missionary workers and locally by the individual participation of the assembly brothers. Some individuals doing local evangelistic work are supported financially by a local assembly, and others are not.

This religious sect has no ruling body or convention. The assemblies hold conferences from time to time, but each local church is autonomous in the management of its affairs. The brothers hold business

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

meetings of the assembly about once a month, and each male member has a voice in the decisions on matters brought before the group.

If an adult brother, believed by members of the assembly to be worthy, will volunteer to undertake evangelistic work, the assembly will provide him with a letter of introduction to any other assembly in any area where he will be visiting as a brother. This document, referred to as a letter of commendation, is ordinarily written by one responsible brother and countersigned by another brother, commending the individual to the gospel work. One reason for the letter of commendation is to reflect in writing the belief of the other brothers that the individual bearing the letter is "called of God to go out and preach the gospel."

Ordinarily, a letter of commendation is addressed to an assembly in the area the individual will be visiting. It will commend him and his family to the fellowship of that particular assembly while he is there. If there is no assembly in the area, the letter is directed to "those gathered to the name of the Lord Jesus Christ * * * somewhere along the road * * * 'and elsewhere.' "

Petitioner has undertaken trips to the rural areas of Western and Northwestern Newfoundland each year since 1964 to carry out evangelistic activities as a minister of his church. These areas were originally chosen because of the large number of poor people living there who, it was felt, would respond to petitioner's preaching. Because of the contacts he made there on earlier trips, he has returned each year to the same areas.

Of the Cuyahoga Falls assembly, only petitioner, his father-in-law, and two or three other individuals not identified by the testimony have undertaken temporary traveling evangelistic efforts. Petitioner took two trips to Newfoundland in both 1967 and 1968—one by plane in the spring and one by automobile and trailer in the summer of each year.

Prior to leaving on his 1967 and 1968 trips, petitioner discussed his plans at one or more meetings of the brothers of the assembly. At those meetings petitioner informed the brothers that he proposed to undertake an evangelistic effort in Newfoundland and asked for the fellowship and approval of the brothers. The brothers furnished petitioner with letters of commendation directed to assemblies in Maine, Vermont, Nova Scotia, and elsewhere along his travel route.

There was no established assembly in Newfoundland during 1967 or 1968. Subsequently, an assembly initially composed of two brothers and their families was started in 1971.

During each of the 1967 and 1968 summer trips, petitioners traveled approximately 5,150 miles and were gone for about 1 month. They traveled by automobile and trailer in the company of another brother

from Toledo, Ohio, who also had a trailer, and were met in Newfoundland by groups of from four to six young bachelors from other assemblies who sometimes stayed overnight in the trailer and ate with them. Petitioners' children accompanied them on these trips.

In Newfoundland petitioner and his group visited rural communities. The group stayed in each community an average of 2 or 3 days, the longest stay being 1 week. The group would first contact the local religious leaders and seek their support for an evangelistic effort. Religious tracts were distributed, and the local people were informed that there would be a meeting or Bible reading or prayer meeting that evening or at some other designated time. Meetings were held in a local townhall, church building, or home; two or three meetings were often held in 1 day. At these meetings petitioner preached and led congregational singing.

The group staying with petitioner attended the meetings along with local people who varied in number between 10 and a maximum of 150. Most of the local people who attended these meetings were of the Christian faith but did not adhere to all the beliefs of petitioner and his assembly. One of the objectives of each trip was to proselyte and convert these people to an acceptance of the fundamentalist doctrine held by petitioners.

Petitioner Esther J. Smith usually cooked for the entire traveling group and took care of her children. She also passed out tracts and attended some of the meetings. The older children helped in the evangelistic work by distributing tracts and other literature. Petitioner Travis Smith did not engage in any recreational activity during these trips.

After each summer trip was concluded, petitioner reported back to his Cuyahoga Falls assembly, showed slides of the places he had visited, and told the assembly what he and his family had done. Each year a typewritten letter was published and sent to other assemblies describing his work and encouraging them to undertake similar efforts.

No reimbursement of his expenses was claimed by petitioner or made by the assembly. He did not report to the assembly on the amounts of his expenses. All the expenses claimed on petitioners' tax returns for 1967 and 1968, detailed below, were paid out of their pockets in cash. These expenditures included the cost of food for the young bachelors who stayed with them in Newfoundland as well as for petitioners' children.

In the spring of 1967 and 1968, petitioner undertook a short trip by plane to Newfoundland for a few days to prepare for the later trip by the entire family. On one such trip in April 1968, petitioner rented a car. The costs of these trips also are included in the claimed deductions for charitable contributions.

In their Federal income tax return for 1967, petitioners claimed deductions for charitable contributions, including $350 for the April 1967 plane trip and $810.65 for the summer trip to Newfoundland. This latter amount was composed of three items: 5,150 miles at 5 cents per mile—$257.50; tolls and ferries—$176.65; and food, laundry, camping—$376.50.

In their 1968 return, petitioners claimed deductions for charitable contributions, including $395 for "Travel to Newfoundland as minister" in April, and $1,079.14 for "Travel to Newfoundland as minister" during August and September 1968. This latter amount was composed of five items: 5,150 miles at 5 cents per mile—$257.50; tolls and ferries—$140.50; food, laundry, camping—$385.75; car rental—$34.20; and car repairs—$261.19.

OPINION

Section 170(a) allows as a deduction any "charitable contribution" paid within the taxable year, and section 170(c) defines the term "charitable contribution" to include gifts "to or for the use of" certain described organizations. Respondent does not deny that the Cuyahoga Falls assembly of which petitioner is a member is an organization of the type described in section 170(c) but contends that petitioner's unreimbursed expenses during 1967 and 1968 in doing evangelistic work were not contributions "to or for the use of" that church assembly.

Petitioner does not claim a deduction for the value of the services which he performed in Newfoundland. Rather, he claims a deduction for the out-of-pocket expenses which he incurred in performing those services. In this connection, section 1.170–2(a)(2), Income Tax Regs., reads as follows:

> No deduction is allowable for contribution of services. However, unreimbursed expenditures made incident to the rendition of services to an organization contributions to which are deductible may constitute a deductible contribution. For example, the cost of a uniform without general utility which is required to be worn in performing donated services is deductible. Similarly, out-of-pocket transportation expenses necessarily incurred in rendering donated services are deductible. Reasonable expenditures for meals and lodging necessarily incurred while away from home in the course of rendering donated services also are deductible. For the purposes of this section, the phrase "while away from home" has the same meaning as that phrase is used for purposes of section 162.

We think this regulation allows the claimed deductions except to the extent discussed below.

At the outset, we note that respondent does not deny petitioner incurred the disputed expenses. Respondent preserves a contention that the expenses were incurred for vacation trips but does not emphasize the argument. Indeed, the foregoing Findings of Fact accord generally with the findings requested by respondent. In any event, we do not think the record would support a finding that petitioner's expenses were

incurred in order to obtain a substantial, direct, personal benefit in the form of a vacation or other recreational outing. Compare *Grey B. (Miller) Tate*, 59 T.C. 543, 550 (1973); *Harris W. Seed*, 57 T.C. 265, 276 (1971); *Sheffels v. United States*, 264 F. Supp. 85, 88–89 (E. D. Wash. 1967), affd. 405 F. 2d 924 (C.A. 9, 1969); *Green v. Bookwalter*, 207 F. Supp. 866, 880 (W.D. Mo. 1962), affd. 319 F. 2d 631 (C.A. 8, 1963).

Respondent's principal argument—that the expenses were not contributions "to or for the use of" petitioners' local Ohio church within the meaning of section 170(c) and hence are not allowable deductions—is summarized in his brief as follows:

The facts show that petitioners' proselyting trips to Newfoundland were their own personal religious enterprise. Their local church at Cuyahoga Falls, Ohio essentially did not initiate, control, supervise, participate in or aid in the particular trips to Newfoundland. Those trips did not directly benefit the local Ohio church economically, religiously, or otherwise.

We think respondent reads the phrase "to or for the use of," as employed in section 170(c), too narrowly. One of the basic functions of petitioner's church is evangelism—spreading the faith through preaching, teaching, and personal persuasion. The overall objective is not to benefit an individual church as such, economically or otherwise, by increasing the size of its membership, but to propagate the faith at home and abroad. Thus, in carrying on the evangelistic work in Newfoundland, petitioner was serving what he and his religious sect regarded as one of the basic objectives of their local church. In a real sense, he was rendering services "to or for the use of" that body.[2]

It is true that petitioner was not ordered or paid to perform these services. Nor did his local church control or supervise the manner in which he performed his work. However, as a member of his local assembly, he·was taught that it was his duty to do missionary work of the kind he performed, and he responded to that teaching by doing it. In order to obtain the letters of commendation, he was required to meet with the governing body of his church and convince that body that he was "called of God to go out and preach the gospel." The letters were given as evidence of the assembly's approval and support, and they were helpful as an introduction to other groups of like faith. If he conducted himself so as to cause the local assembly to lose its confidence in him, the only reasonable inference is that a letter of commendation would be denied. Upon completion of each mission, he reported back to his local church on his efforts and accomplishments, and letters were then published and sent to other assemblies, telling them of his work and urging them to undertake similar ventures. Thus, the effort was

---

[2] The religious sect of which petitioner is a member had no churches or assemblies in Newfoundland in 1967 or 1968. He was not, therefore, rendering services "to or for the use of" an organization in a foreign country.

not merely petitioner's "own personal religious enterprise" but was an undertaking which was approved, encouraged, and aided by his local church.[3]

Nothing in section 170 or in section 1.170–2(a)(2) of the regulations, quoted above, suggests that, as a condition to the deductibility of unreimbursed, service-related expenses, the services must be performed under the control or supervision of the charitable organization. Indeed, the illustrations in the above regulation suggest the contrary and indicate that the expenses need be only "incident" to the rendition of services to a qualified donee. See *Archbold* v. *United States*, 195 Ct. Cl. 278, 285, 444 F. 2d 1120, 1123 (1971). In *Orr* v. *United States*, 343 F. 2d 553, 557 (C.A. 5, 1965), the court considered the deductibility of several travel-related expenses incurred by an individual in serving on a number of boards and committees of the Methodist Church, stating that in order to meet the statutory test, "the charitable work must be the cause of the payments." [4] Cf. *George E. Peace*, 43 T.C. 1 (1964). As discussed above, petitioner's expenses were caused by, or attributable to, the work which he performed in carrying out one of the functions of his church.

Quite clearly, had petitioner merely attended a church convention as a delegate, or a committee or board meeting as a member, where work of the kind which he did in Newfoundland was planned or discussed, his travel and related expenses would be deductible. See, e.g., Rev. Rul. 58–240, 1958–1 C.B. 141.[5] In fact, in *Orr* v. *United States, supra* at 555, the Commissioner allowed the charitable deduction for out-of-pocket,

---

[3] In Rev. Rul. 67–362, 1967–2 C.B. 117, 118, unreimbursed out-of-pocket expenses of a retired businessman performing volunteer services as a consultant were allowed as a deduction on the theory his services furthered the purpose of the Small Business Administration to provide management assistance to small firms. See also Rev. Rul. 70–519, 1970–2 C.B. 62, 63, allowing a deduction for out-of-pocket unreimbursed expenses, such as admission costs and meals (for the beneficiary), incurred by volunteers for underprivileged children selected by an organization formed to reduce juvenile delinquency. The only control or supervision of the volunteers in these rulings appears to have been the selection of the beneficiaries of the volunteers' services.

[4] In *Orr* v. *United States*, 343 F.2d 553, 557 (C.A. 5, 1965), the court makes the "to or for the use of" issue turn on whether the expenses (for automobile insurance, in that case) would have been incurred if the services had not been rendered, as follows:

"The words 'gift to or for the use of' will not stretch to include payments which the taxpayer would have made for non-charitable reasons. The Internal Revenue Service puts the result in terms of whether the payment was 'directly attributable' to the charitable services. Rev. Rul. 58–279, 1958–1 Cum. Bull. 145. We accept this construction in the sense that the charitable work must be the cause of the payments in order for the payments to be deductible. * * *"

[5] Rev. Rul. 58–240, 1958–1 C.B. 141, 142, is in pertinent part as follows:

"it is held that the actual unreimbursed expenses incurred by a lay member of a church in attending, as a delegate, a church convention, * * * and unreimbursed expenses directly connected with and solely attributable to the rendition of such volunteer services by * * * [the lay member] to the church * * * constitute contributions within the meaning of section 170 of the 1954 Code and are deductible in computing taxable income to the extent provided therein. * * *"

See also Rev. Rul. 61–46, 1961–1 C.B. 51, 52, which deals with unreimbursed expenses "directly connected with and solely attributable to the rendition of gratuitous services performed for the church" during a church convention or meeting.

unreimbursed expenses for gasoline and oil, pilot fees, and license registration fees incurred in automobile and airplane travel by a taxpayer in attending meetings of numerous boards and committees of the Methodist Church. Similarly, in the instant case, petitioner, as a member of the governing body of his church, presumably would have been allowed the out-of-pocket cost of attending the meetings in his church where he presented his plans for his trips to Canada and arranged for the letters of commendation. It would be ironic to hold that an expense incident to the performance of these services by petitioner was not a contribution "to or for the use of" petitioner's church while planning them would be. We hold the deductions, subject to the limitations discussed below, are allowable.

Since the meals were eaten "away from home" within the meaning of section 162(a), adopted as the applicable test in the above regulation and in Rev. Rul. 55-4, 1955-1 C.B. 291, 292, cf. *Clinton H. Mitchell*, 42 T.C. 953, 974 (1964), a portion of their cost is deductible, but we do not think all of it is allowable. The record shows that the younger children did not participate in the religious work, so the food expenses attributable to them are not allowable as deductions. Since the food expenses attributable to the young bachelors were not related directly to petitioner's service, they likewise are not deductible. The same is true with respect to the laundry and camping expenses. Accordingly, the deduction for food, laundry, and camping is limited to $150 in each of these years. *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930).

In computing his deductions for the summer automobile-trailer trips, petitioner claimed 5 cents per mile as transportation expense, consistent with Rev. Proc. 64-15, 1964-1 C.B. (Part 1) 676, 677. His claim for parking fees and tolls over and above the standard mileage rate comports with Rev. Proc. 70-12, 1970-1 C.B. 438. The airplane travel and car rental expenses are also deductible.

The automobile repair expense of $261.19 in 1968 is not allowable as a deduction. The words of the court in *Orr* v. *United States*, 343 F. 2d at 558, are apposite:

the taxpayer may deduct the expense for repairs of a vehicle used *solely* for charitable purposes. Here, however, the taxpayer used the vehicles for noncharitable purposes, and the taxpayer has not proved that the repairs were caused by the use of the vehicles for charitable purposes. The taxpayer has the burden of proof. Failure to prove that the charitable use of the vehicles caused the repairs bars the taxpayer's claim for a charitable deduction. [Fn. omitted.]

Proof that the breakdown of the automobile occurred while it was being used for charitable purposes, without more, is not sufficient to support the claimed deduction.

To reflect the foregoing conclusions,

*Decision will be entered under Rule 50.*