SHERMAN H. SAMPSON AND EDYTHE L. SAMPSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sampson v. Commissioner
Docket No. 370-78.
United States Tax Court
T.C. Memo 1982-276; 1982 Tax Ct. Memo LEXIS 473; 43 T.C.M. (CCH) 1408; T.C.M. (RIA) 82276; May 18, 1982. Sherman H. Sampson, pro se. Richard L. Schodorf, for the petitioners post trial. James T. Million, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined the following deficiencies in the petitioners' Federal income taxes: Taxable Year
Deficiency
1973
$ 3,972.30
1974
6,181.74
*475 After concessions, the issues for decision are (1) whether expenditures which petitioner Sherman H. Sampson (hereinafter "petitioner") made in order to purchase drug-related information and to finance "drug buys" in connection with law enforcement operations were for the use of the State of Kansas and its political subdivisions within the meaning of section 170(a), Internal Revenue Code of 1954, as amended; [1] and (2) whether petitioner's security-dog and puppy-retailing activities were engaged in for profit within the meaning of section 183. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners maintained their residence at Mt. Hope, Sedgwick County, Kansas, at the time of the filing of the petition herein.They filed joint Federal income tax returns for the taxable years 1973 and 1974 with the Internal Revenue Service Center, Austin, Texas. Prior to 1971, two of petitioners' four children destroyed their lives by *476 using hard drugs. As a result, petitioner became interested on a deeply personal level in stamping out the sale, distribution, and use of proscribed drugs. Petitioner received a commission as a deputy sheriff from Vern Miller, at that time the local sheriff, and became involved with the TIP (Turn In a Pusher) Line program. TIP Line was a volunteer organization established to receive information from concerned citizens relating to suspected durg activities in the community. TIP Line also paid various individuals for such information. At first, petitioner donated money to TIP Line to help pay its expenses. He began to deal personally with people who called TIP Line, paying them directly for information with his own funds. In 1971, Vern Miller was elected Attorney General of the State of Kansas. He held that office until 1975. After his election, Miller approached petitioner and expressed appreciation for the time and financial support he had provided the TIP Line program and asked him to continue and expand his involvement in the extermination of illegal drugs in his community. Miller conferred upon petitioner a commission as deputy assistant attorney general, requested petitioner *477 to continue to purchase information and, in conjunction with law enforcement authorities, to fund "buys" of heroin through undercover agents under circumstances sufficient to obtain search warrants, thereby leading to raids on caches of illicit drugs. Accepting his commission with zeal and determination, petitioner donated his time, efforts, and money to the operations of the sheriff's office and police department in his community, as well as to the Attorney General's office. He assisted with narcotics investigations conducted both by the Attorney General's office and the local sheriff's department. He continued to purchase information and also provided "front money" with which to make drug buys. Working closely with either the sheriff's or the Attorney General's offices, he helped put together search warrants. As a result of the information petitioner had obtained and of the buys he had financed, law enforcement authorities conducted many successful drug raids. Vern Miller conducted the first four or five raids himself and then allowed the sheriff's department to handle them. All of the raids which Miller participated in were successful. As a deputy assistant attorney general, *478 petitioner was at all times under the general supervision of the Attorney General, Vern Miller. At the outset, Miller instructed petitioner to avoid creating problems and/or embarrassment for the Attorney General's office. As mentioned supra, Miller also specified petitioner's functions in connection with drug enforcement operations--to assist the authorities in obtaining information, making buys, and securing search warrants. Prior to making any "buys," petitioner would always inform Miller. As mentioned above, Miller himself conducted the first raids resulting from petitioner's assistance. At one point, petitioner came across evidence that the County Attorney's son was selling drugs on the street. Petitioner notified Miller of this evidence and expressed his desire to set up a buy. Miller, however, ordered petitioner not to become personally involved in the matter but rather to allow Federal officers to handle it. Petitioner obeyed. During the course of Miller's tenure as Attorney General and while petitioner held his commission, they spoke at least once every week, and during periods of heavy drug enforcement activity, an average of every two to three days. Mr. Keith *479 Sanborn was the County Attorney of Sedgwick County, Kansas, from 1959 until January 1973, at which time he became District Attorney of Kansas' 18th Judicial District, which was geographically coterminous with Sedgwick County. Sanborn held this position until January 1977. His offices were involved in active drug enforcement during 1973 and 1974 in cooperation with the sheriff, police and State and Federal authorities.Petitioner never contacted Sanborn in connection with drug enforcement operations. Their relationship was marked by bitterness and hostility. Vern Miller as Attorney General often conducted drug investigations in Sedgwick County that he believed Sanborn would not pursue. Petitioner never donated any money directly to the State of Kansas or any of its political subdivisions during 1973 and 1974. Any such donations would by law have been turned over to the state auditor for inclusion into the general fund, the appropriation of which was controlled by the State legislature. It is not clear what portion, if any, of such donations would have been appropriated to the Attorney General's budget. Neither the Sedgwick County Sheriff's office nor the Attorney General's *480 office had and duty to report, record, or account for any monies spent by petitioner in connection with his assistance to these offices in their drug operations. Petitioner expended the following amounts during 1973 and 1974 for purchasing information and funding drug buys: 1973
1974
$ 18,494.98
$ 10,585.37
Prior to 1973, petitioner had never engaged in any activity involving the raising or breeding of dogs for sale or the buying and selling of puppies.He had, however, often trained dogs for his personal use. In 1973, petitioner saw a "wolf dog," an animal which results from crossbreeding wolves and German shepherds. He learned that they were large and powerful and became excellent guard dogs when properly trained. In 1973, petitioner entered into the activity of raising guard dogs. He initially intended to raise poodles and also the crossbreed of German shepherds and wolves (wolf dogs) which he had observed. In furtherance of raising poodles, petitioner purchased two poodles, one of which was a male named Rebel; he decided soon afterwards, however, to abandon this activity. Nevertheless, petitioner claimed a half-year's depreciation on Rebl for taxable *481 year 1973 and a full-year's depreciation in 1974. Prior to entering the dog-raising activity in 1973, petitioner neither performed research nor underwent training in connection with such activity. Petitioner continued with breeding and raising wolf dogs. He purchased three German shepherds (Heidi, Lady, and John) and bred them with wolves. At one time, petitioner owned 18 wolf dogs. To contain these animals, petitioner at first used two pens already in place upon his residential property as well as 40 acres of such property which had been fenced "dog tight." The chain-link fence was no match for the wolf dogs, however, who regularly tore through it and attacked and devoured cattle belonging to petitioner's neighbors. The neighbors ultimately took matters into their own hands and began shooting the wolf dogs. Petitioner reimbursed the neighbors for the destroyed cattle and a result sustained losses which rendered continuation of the activity economically infeasible. Petitioner ceased engaging in the activity in the fall of 1974. During 1973, Petitioner devoted approximately one hour per day to the guard-dog activity. At the time, however, petitioner was involved directly *482 or indirectly in many different businesses. At one time he owned 30 of them. The time he allocated to the dogs was thus significant. Petitioner received no assistance in his security-dog-raising activity except for that of a trainer whom he employed for a few months during 1973 or 1974. Petitioner has established and successfully operated many business ventures without prior experience. After terminating the security-dog activity, petitioner formed a partnership on October 1, 1974, with one James Baker for the purpose of buying, selling, and raising dogs. Baker was an heroin addict to whom petitioner had paid a substantial sum of money in return for drug-related information. Baker was subsequently busted for selling heroin. He had become dependent upon petitioner for his livelihood and, after his arrest, had no source of income. He approached petitioner concerning the possibility of buying and selling puppies. Petitioner and Baker travelled to Salina, Kansas, to view a puppy retailing business operated by one of Baker's friends. Petitioner was impressed and decided to enter into the aforementioned partnership with Baker. Under the oral partnership agreement, the partnership *483 was to operate under the name of "Sampson Kennels." Petitioner was to contribute all the funds necessary to construct a dog kennel upon his real estate and to purchase any other property required for the operation of the partnership's business. Petitioner was to be the absolute owner of all property which he purchased or furnished for the partnership until such time as the net profits, if any, were sufficient to reimburse petitioner for such contributions ("payout"). Baker was to perform all labor required and was to receive a partnership draw of $ 100 per week until payout. After payout, profits were to be divided equally. The partnership was terminable at the will of either party. In accordance with the terms of the agreement, petitioner constructed on is property 10 separate kennels and dog runs at a cost of $ 7,237.59, purchased and reconditioned a 1966 Ford Super Van for use in the partnership's operations at a cost of $ 1,371.74, furnished the dogs for breeding purposes, and incurred other partnership expenses. Baker received his $ 100 per week draw but did very little work for the partnership. He did not buy even one puppy. Because of Baker's failure to perform, petitioner *484 terminated the partnership on January 15, 1975. Petitioner's reasons for entering into the partnership with Baker were two-fold. First, he wanted to help Baker recover from his heroin addiction through the meliorative process of hard work. Second, he wanted to earn a profit. Petitioner saw no contradiction in these dual aims.He applied a similar method in the case of his son who had become addicted to hard drugs, placing him in charge of operating a service station, "trying to keep him busy day and night." Petitioner reported the following income and expenses with respect to his dog-raising and retailing activities: 1973
1974
Sale of Dogs
$ 200.00 Depreciation
$ 55.00 110.00 Feed
866.48 499.81 Death Loss
425.00 Taxes
6.48 Medical
512.50 Miscellaneous
10.64 Automobile Expenses
390.41 Net Profit (Loss)
($ 1,346.48)
($ 1,329.84)
No attempt was made to segregate the expenses of the security-dog and dog-raising and selling activities. Of the $ 866.48 claimed for "Feed" for 1973, $ 574.83 was not for feed but was for fences built in 1973. During 1973 and 1974, petitioner had substantial income and assets *485 from sources other than the dog-raising and selling activities. Petitioners deducted $ 23,205.72 and $ 14,581.88, respectively, on their 1973 and 1974 Federal income tax returns for charitable contributions in connection with petitioner's drug enforcement activities as an officer of the Attorney General. These sums do not include amounts which petitioner contributed to TIP Line. In the statutory notice the Commissioner disallowed these deductions in full. He further determined that petitioner's dog-connected activities were not engaged in for profit within the meaning of section 183 of the Internal Revenue Code. OPINION Issue 1. Charitable Contributions
Section 170 of the Internal Revenue Code provides as follows: SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (a) ALLOWANCE OF DEDUCTION.-- (1) GENERAL RULE.--There shall be allowed as a deduction any charitable contribution (as defined in ubsection (c)) payment of which is made within the taxable year. (c) CHARITABLE CONTRIBUTION DEFINTED.--For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of-- *486 (1) A State, a possession of the United States, or any political subdivision of any of the foregoing, or the United States of the District of Columbia, but only if the contribution or gift is made for exclusively public purposes. Petitioner claims that the money he paid to drug informants and that he provided for drug buys while serving as a deputy assistant attorney general was "to or for the use of" the State of Kansas, and/or its political subdivisions, within the meaning of section 170(c)(1). Respondent counters that petitioner spent these funds in pursuance of his own private war on drugs and that, for a number of reasons, they are not deductible. Petitioners rely upon section 1.170A-1(g) of the Income Tax Regulations, which provides as follows: (g) Contributions of services. No deduction is allowable under section 170 for a contribution of services. However, unreimbursed expenditures made incident to the rendition of services to an organization contributions to which are deductible may constitute a deductible contribution. For example, the cost of a uniform without general utility which is required to be worn in performing donated services is deductible. Similarly, *487 out-of-pocket transportation expenses necessarily incurred in performing donated services are deductible. Reasonable expenditures for meals and lodging necessarily incurred while away from home in the course of performing donated services also are deductible. For the purposes of this paragraph, the phrase "while away from home" has the same meaning as that phrase is used for purposes of section 162 and the regulations thereunder. They argue that petitioner, as a deputy assistant attorney general, contributed his services to the State of Kansas, and County of Sedgwick, by aiding the drug enforcement efforts of their legal authorities. The expenses which petitioner incurred in purchasing information and setting up drug buys (drug-related expenses) were "incident to" the performance of these charitable services within the meaning of the above-quoted regulation. At first blush, the regulation seems to support petitioners' position. Petitioner contributed his services to qualified organizations--the State of Kansas and Sedgwick County--in the course of which he incurred the drug-related expenses. He expended these funds, as well as a good deal of time and effort, in order to assist *488 the State and County authorities in the furtherance of a legitimate governmental purpose--the enforcement of narcotics laws. They were normal, routine expenditures traditionally connected with and made in the course of drug enforcement operations. Respondent argues, however, that the drug-related expenses are not deductible under the quoted statute and regulation for several reasons, which we will address in turn. First, respondent contends that the funds were not expended exclusively for public purposes. Petitioner used the Attorney General's commission to cloak his own private war on drugs with colorable legal authority. Further, according to respondent, he engaged in this activity to help his "good friend," Vern Miller, become governor of Kansas by creating favorable publicity. [2] Respondent points to the fact that petitioner never contacted Sanborn, the County (and later District) Attorney concerning his drug enforcement activities. *489 Petitioner was subject to the supervision and control of the Attorney General, and he worked in close cooperation with law enforcement authorities. This is hardly a case of "Dirty Harry"-type extra-legal violence directed against "pushers" in order to exact vengeance.Furthermore, we are convinced that petitioner's overriding motivation in pursuing his drug-enforcement activities was to prevent drug abuse from destroying the lives of other people's children, as had occurred in the case of petitioner's son and daughter. Petitioner was thus inspired by a desire to help his community rather than just himself. We have no doubt that Miller was attempting to enhance his chances of reelection by conducting effective drug enforcement operations--any elected official who wants to keep his job has an incentive to perform well in it. Such an objective does not render his services any less beneficial to the public. It is also clear that petitioner's services were very valuable to Miller in carrying out his program. It is our opinion, however, that petitioner would not have invested so much time and money in fighting illegal drugs if he had merely wanted to help Miller retain his office. *490 As discussed above, his object was to eliminate the evils of drug abuse which had devastated his children. The fact that petitioner never contacted Sanborn does not indicate political motives, but was due to the hostility which resulted from petitioner's effective investigation of Sanborn's son's illegal drug activities. Also, the Attorney General's office pursued cases in Sedgwick County which Sanborn would not. It is thus not clear what benefit, if any, petitioner would have received from contacting Sanborn. Moreover, it is the nature of the contributed services, rather than the petitioner's motivation in performing them, to which we look in determining whether they are "to or for the use of" an exempt organization. Whatever petitioner's reasons for his drug crusade, the services which he rendered directly benefited the State and County in the execution of one of their "exempt" functions--law enforcement.
Respondent's second argument is that the deduction should be disallowed because the State and County had no control over petitioner's services or the amount and application of his drug-related expenditures. In the context of expenses incident to charitable services, however, *491 such control is not required. In Smith v. Commissioner,60 T.C. 988 (1973), the taxpayers belonged to a religious assembly which employed no ordained or paid ministers. Evangelism was one of the assembly's basic functions and was performed by the individual members who frequently bore the costs incurred in the course of such work. The taxpayer undertook evangelistic trips to Newfoundland and claimed deductions for food, laundry, camping, and car rental expenses, for mileage and car repair expenses, and for tolls and ferries. The trips were made on petitioner's initiative and were not controlled or supervised in any way by the assembly of which petitioner was a member. After each trip, taxpayer reported back to his assembly, showed slides of the places he had visited, and described what he and his family had done. The respondent argued that because of the lack of such control and supervision, the expenses were not "for the use of" the exempt organization. In holding in favor of the petitioner, we stated: We think respondent reads the phrase "to or for the use of," as employed in section 170(c), too narrowly. One of the basic functions of petitioner's church *492 is evangelism--spreading the faith through preaching, teaching, and personal persuasion. * * * Thus, in carrying on the evangelistic work in Newfoundland, petitioner was serving what he and his religious sect regarded as one of the basic objectives of their local church. In a real sense, he was rendering services "to or for the use of" that body. It is true that petitioner was not ordered or paid to perform these services. Nor did his local church control or supervise the manner in which he performed his work. * * * Upon completion of each mission, he reported back to his local church on his efforts and accomplishments, and letters were then published and sent to other assemblies, telling them of his work and urging them to undertake similar ventures. Thus, the effort was not merely petitioner's "own personal religious enterprise" but was an undertaking which was approved, encouraged, and aided by his local church. Nothing in section 170 or in section 1.170-2(a)(2) [now sec. 1.170A-1(g)] of the regulations, quoted above, suggests that, as a condition to the deductibility of unreimbursed, service-related expenses, the services must be performed under the control or supervision *493 of the charitable organization. Indeed, the illustrations in the above regulation suggest the contrary and indicate that the expenses need be only "incident" to the rendition of services to a qualified donee. [60 T.C. at 993-994] Smith thus stands for the proposition that an exempt organization need not control or supervise services performed for it in order for related expenses to be deductible. Respondent makes much of the fact that had petitioner donated the funds directly to the Attorney General's or the sheriff's offices, they would have been remitted to the general fund and appropriated by the legislature. As discussed above, however, there is no requirement that the exempt organization control the performance of the charitable services or the related expenditures. Further, the hypothetical possibility that the legislature may have diverted the funds elsewhere does not make them and the underlying services any less related to and in furtherance of the State and County's basic function of law enforcement. Smith is also quite similar to the instant case. Petitioner, like the taxpayer in Smith, served one of the basic purposes of the exempt organizations--the *494 State and County--by assisting their drug enforcement operations. The record shows, in fact, that Attorney General Miller exercised far more control over petitioner than did the assembly over the taxpayer in Smith. At the outset, Miller made clear to petitioner that he was to avoid embarrassing the Attorney General's office or embroiling it in controversy. Petitioner contacted Miller several times each week and kept him informed on planned enforcement activities. Miller at one point ordered petitioner to cease investigating a case--that of Sanborn's son. Petitioner complied. Respondent's third argument is that the expenses in question--for information and drug buys--are not of the "type" contemplated by the regulation. In his view, only such garden variety out-of-pocket expenditures as meals and lodging and car mileage may be deducted pursuant to this provision. His position, however, conflicts both with the clear language of the regulation and with existing case law.The regulation mentions transportation, meals, and lodging expenses not by way of limitation but only as examples of deductible expenditures. We are aware of no restrictions on the nature or type of service-related *495 expenses other than that they be directly caused by the charitable activity. The case of Orr v. United States,343 F.2d 553 (5th Cir. 1965), held that "the charitable work must be the cause of the payments in order for the payments to be deductible." See also Smith,supra at 995 (car repair expenses not deductible because taxpayer did not prove they were caused by charitable use of vehicle). See also Archbold v. United States,195 Ct. Cl. 278, 444 F.2d 1120, 1123 (1971), in which the Court of Claims held that legal fees a taxpayer incurred to preserve a gift of land she had made to the District of Columbia were deductible as charitable contributions for the use of the District. In our case, the expenditures for information and drug buys were directly caused by the petitioner's services to the State and County in helping them to carry out their law enforcement function. They were ordinary and routine in operations of this type, and no doubt displaced similar expenditures which would otherwise have been made with taxpayer money. Respondent finally claims that petitioners have failed to substantiate any of their claimed deductions. *496 It is true that the substantiation in this case is less than ideal. Petitioners submitted in evidence two charts, one for 1973 and one for 1974. Each chart listed the checks which were allegedly used to fund the drug operations, the payee named on the check, and any notation on the check indicating its purpose. Most of the checks were made out to individual payees (other than petitioners). Several had notations such as "undercover agent," "drugs," and "drug money." These we conclude were expended for the purchase of information and drugs. Other checks, however, were made out to Bell Telephone Company or to one of the petitioners without explanation, or bore notations such as "surveillance equipment," "Kaw Korner," or "radio supplies." Petitioners have not shown just what these checks were for and hence their amount is not allowable. Our findings of fact reflect this determination. We hold that petitioners may deduct their substantiated expenditures for the purchase of information and drugs in the amounts set forth in the findings. Issue 2: Activity Engaged in for Profit
The other issue in this case is whether petitioner and the partnership of which he was a member *497 engaged in the security-dog and dog-raising and retailing activities for profit. With respect to the latter activity, we need undertake no detailed analysis.Even were it entered into with the intent to make a profit, no puppies were ever purchased. Partnership business operations thus never commenced and any expenses incurred in 1974 were "preopening" or "start up" costs, not currently deductible. Bennett Paper Corporation v. Commissioner, 78 T.C.     (Mar. 29, 1982). The activities of petitioner prior to formation of the partnership in breeding and selling the security dogs may not be attributed to the partnership. Madison Gas and Electric Co. v. Commissioner,72 T.C. 521, 566-567 (1979), affd. 633 F.2d 512 (7th Cir. 1980). Where an activity is not engaged in for profit, section 183 provides special limitations upon the amount of deductions allowable with respect to such activity. Sec. 183(b).
The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the *498 facts and circumstances must indicate that the taxpayer entered into or continued the activity with the objective of making a profit. Sec. 1.183-2(a), Income Tax Regs. It is not necessary, however, that the activity be engaged in with the exclusive intention of making a profit. Sec. 1.183-2(b)(9), Income Tax Regs. Petitioner has the burden of proving that he engaged in the activity for profit. Welch v. Helvering,290 U.S. 111 (1933). Section 1.183-2(b) of the Income Tax Regulations lists nine factors that should normally be taken into account. We shall discuss the ones which are relevant to our case. The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate a profit motive. Petitioner's testimony as to records maintained was very vague and uncertain. Hence, we are unable to make a finding as to the amount and quality of records maintained other than to say that some were kept. The record shows that petitioner purchased breeding stock, crossed them with wolves, and eventually had as many as 18 wolf dogs at one time. He employed a trainer for several months. He sold several *499 of the dogs in 1974. When the wolf dogs began causing excessive losses by escaping and devouring his neighbor's cattle, petitioner terminated the activity. His conduct therein was thus generally businesslike. Preparation for the activity by the taxpayer points to a profit motive. Petitioner did no research on the security-dog business and underwent no training for it. He stated that he had "seen" wolf dogs and was convinced that they would make excellent police or guard dogs. The amount of preparation in itself thus appears small; we note, however, that petitioner has successfully operated many businesses without prior experience. This factor thus is not as unfavorable to petitioner as may initially appear. The amount of time and effort expended by the taxpayer in carrying on an activity is a factor to be considered. Petitioner spent perhaps one hour per day in the security-dog activity, which at first impression does not appear substantial. At the time, though, petitioner was involved in a large number of business ventures. In this context, the time he devoted to the security dogs was significant. The financial results of the activity are relevant. Continued losses *500 generally indicate that the activity may not be engaged in for profit. The foregoing principle would not necessarily apply to a series of losses during the start-up phase of an activity, however. Petitioner incurred a loss during 1973 in the security-dog activity and then terminated such activity in 1974.Thus we have an abbreviated string of losses, which all occurred at the inception of the activity.As noted above, the petitioner was quick to withdraw from the activity in the face of adverse economic signals. Where the taxpayer has substantial assets and sources of income outside of the activity, it is more probable that the activity is not profit motivated.Petitioner had such assets and sources of income. This factor accordingly weighs against petitioners. Finally, the presence of personal motives in the carrying on of an activity may indicate that it is not engaged in for profit.Conversely, a profit motive may be indicated where an activity lacks any appeal other than profit. Respondent argues that the petitioner derived personal pleasure from training his personal dogs in the past and hence that personal elements were involved. Raising vicious wolf dogs who can tear *501 through chain-link fences and devour cattle seems to us, however, a completely different prospect than playing with Rin-Tin-Tin.Petitioner's enjoyment would have been served by raising more congenial, orthodox breeds; to create an entirely new and unpredictable canine species seems to us a step beyond personal pleasure. Based upon the foregoing analysis, we conclude that petitioner engaged in the security-dog activity for profit. He abandoned the poodle-raising project, however, and thus no depreciation with respect to Rebel is allowable. Also, we are left with the problem of allocating the total 1974 expenses claimed by petitioners between the security-dog activity and the Sampson-Baker partnership. This petitioners did not do. There has been submitted in evidence a list of the checks with which the petitioners paid these expenses. As the partnership was not formed until October 1, 1974, the checks dated earlier would represent expenses of the security-dog activity. Some later checks may as well, but there is no evidence that they do. The earlier checks total to $ 647.70. This amount is accordingly deductible in 1974. The $ 574.83 expended for fences in 1973 and erroneously *502 included in "Feed" is not deductible because it is a capital expenditure. Sec. 263(a). The expense may be depreciated over the life of the security-dog activity, however. Sec. 167(a). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All references are, unless otherwise specified, to the Internal Revenue Code of 1954, as amended.↩
2. Respondent argues that Miller, as Attorney General, had no authority to appoint petitioner as a deputy assistant attorney general. Petitioner counters by citing Kan. Stat. Ann. sec. 75-3111, which provides as follows: The attorney general is hereby authorized to appoint such assistant attorneys general as he or she may deem necessary, who shall each receive an annual salary to be determined by the attorney general within the limits of available appropriations: Provided, The annual salary of any assistant attorney general shall in no case exceed the annual salary of the attorney general as established by law. The attorney general is also authorized to appoint an office assistant; one (1) office deputy who shall be a stenographer; one (1) filing clerk and copyrist; three (3) stenographers; three (3) investigators who shall have and exercise police powers to the same extent as other peace officers; and such other employees as may be necessary to discharge the duties of office. Although this statute appears to confer at least patent authority on the Attorney General to appoint deputies such as petitioner, respondent, employing technical linguistic distinctions, construes it as not providing such authority. Respondent cites no judicial authority for his construction. We deem it irrelevant, however, whether or not the Supreme Court of Kansas would hold that Miller had such de jure authority.We have no doubt but that petitioner was at all times subject to Miller's de facto supervision and control. Further, the existence velnon of such authority has no impact on their beneficial value to the State and County. That is, lack of de jure authority would not protanto↩ render the services petitioner performed any less valuable to the governmental units.