Eldon D. BRINLEY and Mary Alice Brinley, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 84–4722.

United States Court of Appeals, Fifth Circuit.

Feb. 20, 1986.

Kirton, McConkie & Bushnell, Wilford W. Kirton, Jr., M. Karlynn Hinman, Raeburn G. Kennard, Robert P. Lunt, Salt Lake City, Utah, for petitioners-appellants.

Fred T. Goldberg, Jr., Chief Counsel, Robert P. Ruwe, Director, I.R.S. Tax Litigation Div., Michael L. Paup, Chief, Appellate Sec., Glenn L. Archer, Jr., Asst. Atty. Gen., Robert A. Bernstein, Francis M. Allegra, Attys., U.S. Dept. of Justice, Tax Div., Washington, D.C., for respondent-appellee.

Before GARZA, POLITZ and HILL, Circuit Judges.

GARZA, Circuit Judge:

Appellants, Eldon and Mary Alice Brinley, and their son, Derry Brinley, are residents of Georgetown, Texas, and members of the Church of Jesus Christ of Latter Day Saints ("LDS Church"). The LDS Church operates a worldwide missionary program with more than 25,000 unsalaried missionaries proselytizing and performing other religious services in foreign countries and the United States.

By letter dated August 16, 1977, the Church notified Derry Brinley that he had been "called" to serve as a full-time, ordained and unsalaried missionary for a period of two years in the area of Lansing, Michigan. A call to a mission on behalf of the LDS Church develops in part from the judgment and evaluation of local clergymen (called bishops or branch presidents) that a member of their congregation, having demonstrated his (or her) adherence to the faith and doctrines of the religion by observing its standards and commandments, is eligible for missionary service.

During the mission the missionary engages in no other occupation. The LDS Church arranges for the finances to pay the expenses of its missionaries and provides them with budget directives, training, rules and regulations, and extensive supervision. In addition, the Church provides a partial payment for transporation to its missionary training center, to the headquarters of the mission area to be served and to return home at the end of the missionary's term of service. Although the funds for these expenses come from the membership at large, the Church requests that the missionary's daily incidental expenses (other than transportation expenses) be financed by the missionary from his savings or by his family members.

According to the Brinley's, the LDS Church directed them to send a check in the amount of $170 to Murdock Travel, Inc., its designated travel agent, to help

defray Derry Brinley's transportation expenses from Texas to the Church's missionary training center in Salt Lake City, Utah, and from Salt Lake City to Lansing. The Brinleys were also asked to contribute $86 toward Derry Brinley's boarding expenses at the missionary training center. During the latter part of 1977 the Brinleys issued additional checks to their son for expenses that he incurred at the missionary training center and for food, housing, transportation, proselytizing materials and other personal needs.

On their joint income tax return for 1977 the Brinleys claimed a deduction of $942 for the moneys sent to sustain their son during the latter part of 1977. The Brinleys claimed the deduction under § 170 of the Internal Revenue Code ("Code"), which provides in pertinent part:

(1) **General rule.**—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.

\*     \*     \*     \*     \*     \*

(c) **Charitable contribution defined.** —For the purpose of this section the term "charitable contribution" means a contribution or gift to or for the use of—

\*     \*     \*     \*     \*     \*

(2) A corporation, trust, or community chest, fund or foundation—

\*     \*     \*     \*     \*     \*

(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes....

26 U.S.C. § 170.[1] Although the LDS Church is an organization listed on the Internal Revenue Service Publication No. 78, *Cumulative List of Organizations,* contributions to which are deductible under § 170, Appellee, Commissioner of the Internal Revenue Service ("I.R.S."), disallowed the deduction.

The Brinleys petitioned pro se for a redetermination of tax. In a Memorandum Opinion the Tax Court sustained the Commissioner's disallowance of the Brinley's charitable contribution. The Brinleys, who by then had retained counsel, obtained review by the full court in the wake of *White v. United States,* 725 F.2d 1269 (10th Cir. 1984), which held that charitable donations virtually identical to those in the present case were deductible under the Code.

The Tax Court, 82 T.C. 932, unanimously reaffirmed its prior opinion and expressly disagreed with the Tenth Circuit's opinion in *White.* The court concluded that the Brinleys' deduction was improper because the funds contributed to their son and Murdock Travel were not placed under the "control" of the LDS Church. This appeal ensued.[2]

## ANALYSIS

In *White* the Tenth Circuit held that parents' contributions sent directly to their son, while a full-time missionary in the

---

1. In addition, the Treasury Regulations, 26 C.F.R. §§ 1.0–1 *et seq.,* provide in part:

  § 1.170A–1

.     .     .     .     .

  (g) **Contributions of services.** No deduction is allowable under section 170 for a contribution of services. However, unreimbursed expenditures made incident to the rendition of services to an organization contributions to which are deductible may constitute a deductible contribution. For example, the cost of a uniform without general utility which is required to be worn in performing donated services is deductible. Similarly, out-of-pocket transportation expenses necessarily incurred in performing donated services are

deductible. Reasonable expenditures for meals and lodging necessarily incurred while away from home in the course of performing donated services also are deductible. For the purposes of this paragraph, the phrase "while away from home" has the same meaning as that phrase is used for purposes of section 162 and the regulations thereunder.

2. The Tax Court's original opinion also determined whether Eldon D. Brinley was entitled to deduct certain educational travel and business expenses in connection with his work as a college professor. These issues were not considered in the court's Supplemental Opinion and are not before us in this appeal.

service of the LDS Church, were deductible under § 170 "because the expenditure primarily serves the church." *White,* 725 F.2d at 1272. The court specifically held that:

> [T]he control test ... is not the appropriate test to determine the deductibility of payment of expenses of others who perform services to benefit a charity ... the proper test, we hold, is the same as when the expenditure is for expenses personally incurred—whether the primary purpose is to further the aims of the charitable organization or to benefit the person whose expenses are being paid.

*Id.* at 1271–72.

The Brinleys urge this Court to follow *White* in rejecting the "control" test and in adopting the "primary benefit" test for determining whether expenses incurred in the rendition of services are "to or for the use of" a charity and, therefore, deductible. The government, on the other hand, contends that the primary benefit test is appropriate only where the taxpayer claiming the deduction actually renders the charitable services. According to the government, where the person rendering the charitable services is not the taxpayer claiming the deduction, the expenses incidental to the rendition of the services are "to or for the use of" a charity only if the charitable organization has full control over the funds. Both sides rely on this Court's opinion in *Winn v. Commissioner,* 595 F.2d 1060 (5th Cir.1979), in support of their position.

In *Winn* the taxpayers claimed a deduction for a $10,000 check payable to the "Sara Barry Fund" and given to Sara Barry's father (a Presbyterian minister) for deposit in her personal account. Sara Barry was sponsored by the Benoit Presbyterian Church and other Presbyterian churches to engage in missionary work in Korea. We held that

> a donor can earmark a contribution given to a qualified organization for specific [charitable] purposes without losing the right to claim a charitable deduction ...

[and that] ... [s]uch a contribution still would be 'to or for the use of' a charitable entity despite the fact that the donor controlled which of the qualified entity's charitable purposes would receive the exclusive benefit of the gift.

*Winn,* 595 F.2d at 1065.

In so holding, we relied on *Bauer v. United States,* 449 F.Supp. 755 (W.D.La. 1978), *aff'd.* 594 F.2d 44 (5th Cir.1979), which held that a charity need not have full control of the donated funds to satisfy the "for the use of" requirement. *See Bauer,* 449 F.Supp. at 759. *See also Morey v. Riddell,* 205 F.Supp. 918 (S.D.Calif.1962); *Archbold v. United States,* 444 F.2d 1120 (Ct.Cl.1971); *Sico Foundation v. United States,* 295 F.2d 924 (Ct.Cl.1961). The government's contention that the LDS Church must have full control over the funds in question to support the Brinley's charitable contribution deduction must, therefore, be rejected.

However, the fact that the LDS Church need not have full control of the funds does not, as the Brinleys urge, translate into a rejection of control as a test for determining whether expenses incurred in the rendition of services to charity are deductible under § 170. This Court applied a control test in *Winn* and found that the Benoit Presbyterian Church had control over the taxpayers' donation.

> Proof that the church in Benoit sponsored 'Sara Barry Days' for the express purpose of collecting funds for this part of its work, that an officer of that church took the funds donated and dealt with them as the church wished, and that the funds went to the support of the work the church intended is sufficient to establish that the funds were donated for the use of the Benoit Presbyterian church.

*Winn,* 595 F.2d at 1065. With the exception of *White,* none of the other authorities cited by the Brinleys require or support a rejection of control as a legitimate gauge for determining the deductibility of expenses incidental to charitable service.[3]

---

3. The Brinleys have cited the following authorities:

We must disagree with *White* to the extent that it so holds.

### Primary Benefit Test as an Appropriate Standard

■ Nonetheless, we conclude that *White* is correct in holding that it was not necessary for the LDS Church to have control over the funds given directly to its missionaries in order to support charitable contribution deductions under § 170. As the Brinleys correctly note, the standard in this Circuit for determining the deductibility of expenditures incurred in the service of charity is one of causation: "The charitable work must be the cause of the payment in order for the payment to be deductible." *Orr v. United States*, 343 F.2d 553, 557 (5th Cir.1965).

In *Orr* the taxpayer owned an automobile that he used exclusively for charitable purposes. He sold that automobile and acquired another which he used, in part, for non-charitable purposes. We noted that the taxpayer was entitled to full charitable deductions for the expenses of the vehicle used solely for charitable purposes, but that the expenses of the second vehicle, which would have been made if no charitable work had been done (*e.g.*, insurance premiums), were not deductible. "The words 'gift to or for the use of' will not stretch to include payments which the taxpayer would have made for non-charitable reasons." *Orr*, 434 F.2d 557. We conclude, as a general matter, that charitable work is the cause of an expenditure if the charity is the primary beneficiary of the expenditure.

The government contends that the primary benefit approach should not be applied in the present case for several reasons. First, it claims that the Brinleys' payments are non-deductible expenditures within the meaning of § 262 of the Code[4] because they were made to a private individual and not to a qualified recipient under § 170. We find no merit in this argument. Section 1.262–2(c) of the Regulations states that "[c]ertain items of a personal, living, or family nature are deductible to the extent provided under ... (5) Section 170 (charitable, etc., contributions and gifts)." The government's argument that the Brinleys' contributions are nondeductible in the absence of control because they were, in fact, given directly to their son and not the Church obscures and begs the basic question: whether these payments are expenditures incident to the rendition of services to a charity within the meaning of § 170 and § 1.170A–1(g) of the Regulations and, therefore, deductible.

■ The government next asserts that whenever a taxpayer donates funds to an

*Bauer v. United States*, 449 F.Supp. 755 (W.D. La.1978), *aff'd*, 594 F.2d 44 (5th Cir.1979) (fact that taxpayer knew the identity of recipient of scholarship prior to disbursement of funds did not preclude charitable contribution deduction); *Archbold v. United States*, 444 F.2d 1120 (Ct.Cl.1971) (legal fees a taxpayer incurred to preserve a gift of land she had made to the District of Columbia were deductible as charitable contributions for the use of the District); *Rockefeller v. Commissioner*, 76 T.C. 178 (1981), *aff'd* 676 F.2d 35 (2d Cir.1982) (taxpayers permitted to deduct employees' salaries and other expenses related to rendering charitable services); *Smith v. Commissioner*, 60 T.C. 988 (1973) (taxpayer permitted to deduct his and his children's expenses incident to the rendition of missionary work); *Sampson v. Commissioner*, 43 T.C.M. (C.C.H.) 1408 (1982) (expenditures made in order to purchase drug-related information and to finance "drug buys" in connection with law enforcement operations were "to or for the use of"

the State); *McCollum v. Commissioner*, 37 T.C.M. (C.C.H.) 1817 (1978) (taxpayers permitted to deduct their and their children's expenses in connection with their rendition of services to the National Ski Patrol); *Davenport v. Commissioner*, 34 T.C.M. (C.C.H.) 1585 (1975) (taxpayer permitted to deduct certain payments in support of his son's missionary work).

Although we agree that these authorities do not support application of a control requirement in the case at bar, we wish to emphasize that they do not undermine the validity of the control test or preclude its application to expenditures incident to the rendition of charitable work.

4. Section 262 provides: [Personal, living and family expenses]

Except as otherwise provided in this chapter, no deduction shall be allowed for personal, living or family expenses.

individual representing a charity or earmarks funds donated to a charity for a specified individual a control test must be applied to assure the taxpayer's charitable intent. The government reasons that charitable intent is assured, and that a "gift to or for the use of" a charitable organization is made, only where the donor's contribution to a charity is indefinite. We agree that deductible donations to a charitable organization must not be restricted for the benefit of a particular individual. *See Tripp v. Commissioner*, 337 F.2d 432 (7th Cir.1964); (payments to a college scholarship fund that were earmarked for a particular individual were for the benefit of the student and not deductible); *Fausner v. Commissioner*, 55 T.C. 620 (1971) (payments to parochial schools attended by taxpayer's children were not acts of detached and disinterested generosity, but were for the anticipated benefit of those children); *Thomason v. Commissioner*, 2 T.C. 441 (1943) (denying a deduction for a donation to a qualified welfare agency to pay for the schooling of a specific individual).

■ A different situation arises, however, where an individual contributes services to a qualified organization. In these circumstances "indefiniteness" is not a relevant consideration, since both the donor and beneficiary (the charity) are ascertained. While § 170 prohibits deductions for the value of services rendered, "unreimbursed expenditures made incident to the rendition of services ... may constitute a deductible contribution." 26 C.F.R. § 1.170A–1(g). Moreover, as we noted in *Orr*, charitable intent is also an irrelevant consideration: "[s]ince the test is one of causation, the taxpayer's motivation is irrelevant to the determination whether the payment is a charitable contribution." *Orr*, 343 F.2d at 557.

The government next contends that § 1.170A–1(g) of the Regulations, by its terms, does not apply to payments made to cover the expenses incurred incident to another taxpayer's service to charity. The government claims that to hold otherwise would result in a merger of parents and

son into a single taxpaying unit. In addition, the government fears that a liberal construction of § 1.170A–1(g) will result in at least two specific abuses of the income tax system: (1) a double deduction for a single expenditure, *i.e.*, one deduction by the taxpayer making the payment and another by the taxpayer rendering the service; and (2) a shifting of deductions from individuals in low-income tax brackets to individuals in high-income tax brackets.

Although we share some of the government's concerns, we find nothing on the face of § 1.170A–1(g) that expressly limits deductions for expenditures incurred in the rendition of charitable work to the person who actually performs the service. Moreover, it does not necessarily follow that allowing the Brinleys to deduct the funds which they advanced to their son to finance his charitable work will result in a merger of separate taxpaying units, a shifting of deductions from lower to higher income tax brackets, double deductions or other abuses of the income tax laws.

■ We conclude that rigorous application of a primary benefit analysis precludes serious possibility of abuse. As applied to the case at bar, the Brinleys' contributions would be deductible under § 170 only if they can show that each payment to Derry Brinley or a third party primarily benefited the LDS Church. Thus, while expenditures for proselytizing materials and out-of-pocket transportation expenses incurred in performing missionary work would be for the benefit of the Church and deductible, recreation and personal expenditures would be primarily for the benefit of the individual missionary and non-deductible.

■ Public policy requires that the taxpayer have the administrative burden of proving that a particular payment primarily benefited a charitable organization and is, therefore, deductible under § 170. *Sampson v. Commissioner*, 43 T.C.M. (C.C.H.) 1408 (1982) illustrates the point:

Petitioners submitted in evidence two charts, one for 1973 and one for 1974. Each chart listed the checks which were

allegedly used to fund the drug operations, the payee named on the check, and any notation on the check indicating its purpose. Most of the checks were made out to individual payees (other than petitioners). Several had notations such as 'undercover agent,' 'drugs,' and 'drug money.' These we conclude were expended for the purchase of information and drugs. Other checks, however, were made out to the Bell Telephone Company or to one of the petitioners without explanation, or bore notations such as 'surveillance equipment,' 'Kaw Korner,' or 'radio supplies.' Petitioners have not shown just what these checks were for and hence their amount is not allowable.

*Id.* at 1414–15.[5] We cannot determine, on the record before us, whether the whole or any part of the $942 claimed by the Brinleys primarily benefited the LDS Church.

*"Away From Home" Limitation*

The government finally contends that, notwithstanding a primary benefit analysis, the Brinleys cannot claim a deduction for expenditures related to Derry Brinley's meals and lodging because such expenditures were not "necessarily incurred while away from home in the course of performing donated services." 26 C.F.R. § 1.170A–1(g). The government notes that "the phrase while 'away from home' has the same meaning as the phrase is used for purposes of section 162 and the regulations thereunder." *Id.*

Section 162 provides in part:

(a) In general—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\*      \*      \*      \*      \*      \*

(2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business....

26 U.S.C. § 162.

In discussing the phrase "away from home" within the meaning of § 162(a)(2) we have stated that

The question of whether a taxpayer is away from home within the meaning of section 162(a)(2) is essentially a question of fact to be determined from all the facts and circumstances of the case, but the principles that guide the decision have long been established. A taxpayer's home, for purposes of section 162(a)(2), means the vicinity of his principal place of employment and not where his personal residence is located, if such residence is located in a different place from his principal place of employment. When a taxpayer who maintains a residence in the vicinity of his principal place of employment is required to travel to a different location for temporary work, he is considered to be 'away from home'. A taxpayer who accepts permanent or indefinite employment in a location different from that of his residence, however, is considered to have moved his tax home

---

**5.** The dissenting opinion accepts wholeheartedly the government's contention that anything short of a full control test invites income tax abuse in the form of deduction-shifting and double deductions. The dissent's concern over shifting of deductions from low to high income tax brackets stems from the mistaken assumption that two taxpaying units are connected with the charitable expense. In fact, only the taxpayer incurring the expense, here the parent, is entitled to claim a deduction.

The dissent's additional fear that the taxpayer who is not entitled to claim a deduction, here the missionary, may also claim a deduction, though a concern to us, provides no basis to disallow a deduction for a contribution which is

"for the use of" a charitable organization. The dissent's position would frustrate the Congressional intent underlying § 170 in the name of administrative convenience for the I.R.S. Such a view misconstrues the function of this Court and the role of the I.R.S. in the administration and enforcement of our tax laws. We would stress, moreover, that nothing in the Court's opinion precludes the I.R.S. from requiring the taxpayer claiming the charitable deduction to prove that the individual rendering the charitable service has not taken a deduction for the same expense, or from otherwise increasing the taxpayer's administrative burden in order to prevent abuse.

to the new location, and is therefore no longer considered away from home. A job may be considered indefinite or permanent if, under all the circumstances, it appears likely to last beyond a short period of time, even if there is no firm commitment that it will do so. A job which is temporary at the outset, may become permanent or indefinite by a change of circumstance or merely the passage of time. Finally, an itinerant worker who maintains no permanent residence is never considered away from home because he has no home to be away from.

*Michel v. Commissioner,* 629 F.2d 1071, 1073 (5th Cir.1980) (Unit B) (citations omitted). Moreover, in *Jones v. Commissioner,* 444 F.2d 508, 510 (5th Cir.1971) we stated that "if the [taxpayer's] prospects are that his work will continue for an 'indefinite' or 'intermediate' [sic-indeterminate] or 'substantially long' period, then the deduction is disallowed." (quoting *Wright v. Hartsell,* 305 F.2d 221, 224 (9th Cir.1962)).

■ Applying the "away from home" concept in the context of § 170, we must conclude that Derry Brinley's tax home during the period of his service to the LDS Church was in Lansing, Michigan, and therefore, that his donated services were not performed away from home. Consequently, the Brinleys' expenditures for Derry Brinley's meals and lodging are not deductible under § 170. *Cf. Ford v. Commissioner,* 227 F.2d 297, 299 (4th Cir.1955) (denying deductions for meals and lodging during a two-year absence from home); *Jones,* 444 F.2d at 510 (approving *Ford* ).[6]

*Control Test as an Appropriate Standard*

A showing that a particular payment primarily benefited the individual missionary would not, however, preclude a charitable

deduction for the donor provided the charitable organization had control over the funds. As noted earlier, control of the $10,000 payment in *Winn, supra,* was sufficient to establish that the funds were donated "for the use of" the Benoit Presbyterian Church. *See Winn,* 595 F.2d at 1065. Once it was determined that the funds were within the control of the Benoit Church it became irrelevant whether any or all of the $10,000 contribution primarily benefited the church or Sara Barry, or whether part of the payment covered expenditures for meals and lodging not "away from home." Thus, the Brinleys would be entitled to deduct their $942 in payments if the LDS church had control over the funds.

■ To have control over donated funds is to have discretion as to their use. Thus, funds donated to a charitable organization with the restriction from the donor that the funds be used for the benefit of some private individual are not deductible. *See Tripp v. Commissioner,* 337 F.2d 432, 435–36 (7th Cir.1964); *Thomason v. Commissioner,* 2 T.C. 441, 443–444 (1943). In these cases the charitable organization did not solicit donations for specific charitable purposes and had no control and discretion as to the use of the donated funds.

A different situation arises, however, where the charitable organization solicits funds for a specific charitable purpose. In these circumstances the charity has control and discretion because it has created a specific charitable cause and has solicited funds in support of that cause. Thus, in *Winn* it was essential that the Benoit Presbyterian Church established a "Sara Barry Fund" and sponsored "Sara Barry Days" for the express purpose of collecting funds to support Sara Barry's missionary work in Korea.

**6.** The Brinleys contend that the "away from home" language is immaterial because it occurs in an example listed under § 1.170A–1(g) and, therefore, in a non-operative portion of the Regulation. We think that in the context of a primary benefit analysis the phrase is far from immaterial. It is readily apparent that expenditures incurred for meals and lodging away from

home primarily benefit the charity, while such expenditures incurred at home primarily benefit the individual. Once again, "[t]he words 'gift to or for the use of' will not stretch to include payments which the taxpayer would have made for non-charitable reasons." *Orr,* 343 F.2d at 557.

The fact that an officer of that church (Sara Barry's father) had possession of the donated funds did contribute to the degree of the church's control. However, full control in the form of actual or physical possession of the donation was not crucial to our finding that the Benoit Church "dealt with [the funds] as the church wished." *Winn*, 595 F.2d at 1065. Thus, we conclude that a charitable organization's control is established where a specific charitable purpose is created and a donation is made in response to the charity's solicitation for funds in support of that purpose.

The Brinleys contend that the Church exercised control over the funds in question. First, they assert that Derry Brinley was an agent of the LDS Church and that, therefore, a contribution given to Derry Brinley was a contribution within the control of the Church. Second, the Brinleys contend that the Church exercised control (1) by directing the Brinleys to make certain donations; (2) by requiring Derry Brinley to undertake certain expenses and to account for such expenses; and (3) by supervising and controlling Derry Brinley's daily activities while a full-time missionary. The Brinleys maintain that the case at bar is similar to *Winn* in all significant respects. We disagree.

■ Derry Brinley's status as an agent of the LDS Church, though not irrelevant, is not a critical factor. The Brinleys have repeatedly cautioned this Court against exalting "form over substance" in arguing that *Winn, supra,* should not be construed to require actual or physical control over donated funds. We agree. Conversely, to hold that control is satisfied merely because Derry Brinley, albeit an agent of the Church, received the donated funds also raises "form over substance" and deviates from the real inquiry: whether the LDS Church had control over the funds and, therefore, discretion as to their use. *Compare Cook v. Commissioner*, 37 T.C.M. (C.C.H.) 771 (1978) (denying deduction for contributions to individual ministers on the ground that there was no evidence that the recipients spent the money on church-related activities) *with Peace v. Commissioner,* 43 T.C. 1 (1964) (allowing deduction for funds donated to a church mission society with the stipulation that specific amounts should go to each of four designated missionaries because "[a]n examination of the totality of the facts and evidence" demonstrated that the church retained control of the actual expenditure of the funds).

As discussed above, *Winn* involved a specific church-established charitable purpose (Sara Barry's mission work in Korea) and a donation made (to the "Sara Barry Fund") in response to a Church-sponsored solicitation drive ("Sara Barry Days"), which was created to collect funds in support of that purpose. By contrast, the case at bar involves a general church-established charitable purpose (the LDS Church's worldwide missionary program) and a general, ongoing solicitation of funds in support of over 25,000 missionaries rendering services for that charitable purpose. In contrast to the Benoit Presbyterian Church, the LDS Church did not establish a "Derry Brinley Fund" or "Derry Brinley Days" to collect funds for his mission work in Michigan. Derry Brinley constituted, at most, $1/25,000$ of the Church's worldwide missionary effort.

■ We do not suggest that the LDS Church must divide its missionary structure and create 25,000 missionary projects to establish control over funds given in support of its missionaries. In fact, we conclude that control would be established in the present case, and that the Brinleys would be entitled to a charitable deduction, if the Brinleys can show that the Church requested them to make specific payments and that they responded to these specific requests. In other words, the Brinleys must demonstrate a "matching" between request and expenditure; contributions given in excess of the Church's request, however, would not be deductible. In this manner, the Church retains control and discretion as to the use of the donated

funds.[7] We cannot determine, on the record before us, whether the LDS Church had control over all or any part of the $942 claimed by the Brinleys.

## CONCLUSION

In conclusion, we hold that the deductibility of expenditures incurred in the rendition of services to charity is essentially a question of fact to be determined from all the facts and circumstances on a case-by-case basis, and that a charitable deduction under § 170 and § 1.170A–1(g) of the Regulations may be taken if it meets either the control test or the primary benefit test or a combination of both. We reject the notion that the primary benefit test is to be applied to the exclusion of the control test, or vice-versa—regardless of whether the person rendering the services is the taxpayer claiming the deduction.

Thus, we hold that the Tax Court erred in concluding that the LDS Church must exercise full control over funds sent directly to its missionaries in support of their mission work in order for the funds to be deductible under § 170. The Brinley's payments would be deductible if they primarily benefited the LDS Church or if the Church maintained discretion as to their use. The evidence in the record before us does not establish that the LDS Church had control over the Brinleys' payments or that any part thereof primarily benefited the Church.

■■■ We conclude, however, that the evidence in this case could not have been adequately developed in the proceedings before the Tax Court because the court heard the Brinleys' pro se petition, while following and applying an erroneous legal standard—the "full control" test. Of course, we realize that the guidelines we announce were not before the court at the time of the Brinleys' trial. Nonetheless,

justice requires that the Brinleys be given the opportunity to present evidence in light of the appropriate standard outlined above. Therefore, we vacate the Judgment of the Tax Court and remand for proceedings consistent with this opinion.

**VACATED AND REMANDED.**

ROBERT MADDEN HILL, Circuit Judge, dissenting.

Although I am mindful that the practice of making charitable contributions is a most worthy attribute of our society and should be encouraged since it aids in the accomplishment of many social goals which our federal and local governments otherwise cannot or will not accomplish, I nevertheless am of the opinion that the majority here has expanded the concept of charitable contribution beyond that provided for in our tax laws. Accordingly, I must respectfully dissent.

The majority, following the lead of the Tenth Circuit in *White v. United States*, 725 F.2d 1269 (10th Cir.1984), has concluded that a taxpayer who pays the unreimbursed expenses incurred by another (in this case a dependent son) in the performance of services to a charity is entitled to deduct such payments from taxable income as a charitable contribution. In doing so, the majority not only adopts a primary benefit test as an appropriate standard in determining whether the challenged payments are charitable contributions, but goes on to conclude that under a liberalized control test the challenged payments may also be eligible for classification as charitable contributions. I am compelled to conclude, as did the Tax Court in this case,[1] that the primary benefit test cannot be utilized to test the validity of payments made to cover the unreimbursed expenses of another, but rather that the control test must be used, and that even under an expansive reading of the control test the

---

**7.** We would emphasize that the taxpayer bears the burden of demonstrating control in the absence of actual or physical possession. As noted in footnote 5, *supra,* nothing in the Court's opinion precludes the I.R.S. from increasing the taxpayer's burden so as to prevent abuse.

**1.** The decision of the tax court in *Brinley II* was unanimous; sixteen judges of the Tax Court concurred in the opinion, and one judge did not participate in the decision.

payments made by the Brinleys to their son cannot be deemed charitable contributions.

## I.

The starting point for the resolution of this case begins with the provisions of the Code authorizing the deduction of charitable contributions and with the relevant Treasury Regulations on Income Tax. Section 170 of the Code[2] provides that there shall be allowed as a deduction a "gift or contribution to or for the use of" an organization formed and operated exclusively for charitable purposes.[3] To ensure that a contribution is designed to benefit a worthy charitable purpose and not, instead, the taxpayer, section 262 of the Code provides that "no deduction shall be allowed for personal, living and family expenses." Relief from the strictures of section 262 is found in sections 1.262–1(b)(5) and (c)(5) of the Treasury Regulations on Income Tax (Regulations).[4] This section provides that expenses deductible under section 1.170A–1(g) of the Regulations are not subject to the prohibition language of section 262 of the Code. Section 1.170A–1(g) provides that "no deduction is allowed ... for a contribution of services" to a charitable organization; however, it goes on to recognize that "unreimbursed expenditures made incident to the rendition of services to an organization, contributions to which are deductible, may constitute a deductible contribution," as well as "out-of-pocket transportation expenses necessarily incurred in performing donated services...." Additionally, it provides that "[r]easonable expenditures for meals and lodging necessarily incurred while away from home in the course of performing donated services are also deductible."

Thus, under the applicable provisions of the Code and Regulations, a taxpayer may deduct as a charitable contribution payments made "to or for the use of" a qualified charity including "unreimbursed expenditures" which are incurred by the taxpayer in connection with his rendering of services to the charity.

## II.

The majority holds that the payments made by the Brinleys to their son may be properly classified either as unreimbursed expenses in connection with the rendering of services or as contributions made to the church. The majority further holds that different standards apply in determining the deductibility of unreimbursed expenses and of contributions. While I agree with the majority's basic proposition that a primary benefits analysis applies to unreimbursed expenses and that a control analysis applies when taxpayers argue that a contribution benefiting a named individual qualifies as a contribution made to a charitable organization, I disagree with their assumption that payments made to a third party may be properly characterized as unreimbursed expenses. In my opinion, a taxpayer who makes payments to a third party must meet the control test in order to qualify for a charitable deduction.

First, like the Tax Court, I am of the opinion that applying the primary benefits test to expenses incurred by an individual other than the taxpayer creates incentives

2. Section 170 provides, in part, as follows:
    (a) ALLOWANCE OF DEDUCTION.—
        (1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.
            *    *    *    *    *    *
    (c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

            *    *    *    *    *    *
    (2) A corporation, trust, or community chest, fund, or foundation—
        (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes.

3. The Church qualifies as a charitable organization within the meaning of section 170. *See* IRS Publication No. 78, *Cumulative List of Organizations* 216 (1984).

4. All reference to sections of the Treasury Regulations are under 26 C.F.R.

for taxpayer abuse. In ascertaining the deductibility of unreimbursed expenses the nexus between the services rendered and the expense incurred is a vital factor. There is a restraining influence on the nature and the amount of expenses caused by the nexus requirement when the right to deduct an expense is limited to the individual performing the services. If the individual incurring an expense is to be reimbursed by another, then the motive that individual might have in incurring reasonable expenses is diminished. The risk of abuse is heightened when the taxpayer is making payment to an individual he would be supporting anyway as there is no internal check, insuring that the costs are incurred solely in connection with the charitable work. Moreover, when the taxpayer deducts another person's expenses, a shifting of deductions occurs that does not occur when the taxpayer deducts his own expenses. Taxpayer parents in high income tax brackets may be tempted to shift their lower income bracket children's deductions to themselves. Without the oversight of the charitable organization, parents could contribute larger than necessary amounts to their missionary child and claim the money was contributed to support charitable activities. If the donor can contribute directly to the missionary, the IRS will be forced to investigate the adequacy of the organizational oversight provided by the charity; this places a heavy burden on an already overwhelmed IRS facing reduced investigatory resources. However, if the money must first go to the charity, the charity will see that the money is spent for the benefit of the charity and not an overcontribution for the child's benefit. This small increase in the administrative burden on the charity is far outweighed by the increased administrative burden the majority places on the IRS. Thus, the Church will and should conduct the oversight that the majority is now forcing the IRS to conduct.

As the majority admits in its opinion, the use of the primary benefit test also causes an increased chance of improper double deductions. Both the donor patient and the missionary child may attempt to deduct the expenses incurred by the child. However, if the money is given to the Church, this potential problem is avoided because the missionary cannot take the deduction since the expenses will not be unreimbursed. Under the majority's position, the IRS will be forced to compare the tax returns of parents and missionary children to determine if double deductions are impermissibly occurring.

Lastly, I believe that application of the primary benefits test is unsupported by existing case authority. With the exception of the majority's opinion and that of the Tenth Circuit in *White*, the case law, including this circuit, has consistently employed the primary benefit test only in those instances where the taxpayer has sought a charitable deduction for his own expenses.[5] *See, e.g. Babilonia v. Commissioner*, 681 F.2d 678, 679 (9th Cir.1982); *Sheffels v. United States*, 264 F.Supp. 85, 89 (E.D.Wash.1967), *aff'd.*, 405 F.2d 924 (9th Cir.1969); *Orr v. United States*, 343 F.2d 553, 557 (5th Cir.1965); *Green v. Bookwalter*, 207 F.Supp. 866, 880 (W.D.Mo. 1962), *aff'd.*, 319 F.2d 631 (8th Cir.1963); *Seed v. Commissioner*, 57 T.C. 265, 276 (1971); *Fausner v. Commissioner*, 55 T.C. 620, 624 (1971); and *Saltzman v. Commissioner*, 54 T.C. 722, 725 (1970). In those instances where the taxpayer had made a payment to another individual as a representative of a charity or has been identified by the taxpayer as the intended beneficiary, the control test has been applied. *See, e.g., Winn v. Commissioner*, 595 F.2d 1060, 1065 (5th Cir.1979); *Tripp v. Com-*

---

5. Where parents themselves provide services to their church, as by driving their volunteer son to the place where he would perform charitable work, I see no reason why the primary benefits test would not apply to determine deductibility of expenses incurred incidental to the *parents'* services. I also note that there is case authority applying the primary benefits test to expenses incurred by minor dependent children as well as parents when charitable services are provided by all members of the family working together. *See e.g. McCollum v. Commissioner*, 37 T.C.M. (CCH) 1817 (1978); *Smith v. Commissioner*, 60 T.C. 988 (1973).

*missioner,* 337 F.2d 432, 435–36 (7th Cir. 1964); *Peace v. Commissioner,* 43 T.C. 1, 7–8 (1964); and *Thomason v. Commissioner,* 2 T.C. 441, 443 (1943). In my opinion no valid reason has been expressed in the majority's opinion to deviate from the traditional application of the control test here.[6]

### III.

My second point of disagreement with the majority opinion relates to its formulation of the control test. Under the control test the issue is whether the charity possessed control of the contribution so as to have discretion as to its use. This was the issue in *Winn v. Commissioner, supra,* wherein we held deductible as a charitable contribution a contribution in response to an appeal by a church to assist a certain person in her church missionary work. In so finding, however, we noted as a basis for our holding that even though the donor made the contribution payable to a fund named for the person the subject of the appeal, "an officer of that church took the funds donated and dealt with them as the church wished." 595 F.2d at 1065.[7] Other cases have also applied the control test in the same fashion where donors made contributions under a similar factual background. *See, e.g., Tripp v. Commissioner,* 337 F.2d at 435–36 (payments earmarked for a particular individual's education not deductible where payments were "not to a general scholarship fund to be used as the college saw fit. . . .").

Likewise, the Tax Court has applied the control test in determining the deductibility of contributions to a charity earmarked for a particular individual and in determining the deductibility of contributions to an individual representing a charity. *See, e.g.,* *Peace v. Commissioner,* 43 T.C. at 7–8 (funds donated to church mission society on condition that specific amounts go to four designated missionaries are deductible since taxpayer intended contribution was to "go into common pool to be distributed only as mission itself determined."); *Thomason v. Commissioner,* 2 T.C. at 443 (contribution to qualified welfare agency to pay for a specific individual not deductible because it amounted to a gift to the individual: "Charity begins where certainty in beneficiaries ends.").

The control test is nothing more than an outgrowth of the basic definition of a charitable contribution. The essential characteristics of a charitable contribution is its "indefiniteness." *Russell v. Allen,* 107 U.S. 163, 167, 2 S.Ct. 327, 330, 27 L.Ed. 397 (1882). This principle was enunciated by the Tax Court in *Thomason v. Commissioner, supra:* "Whenever the beneficiary is designated by name and his merit alone is to be considered, the bequest is private and not public and ceases to have the particular merit of a charity." 2 T.C. at 444. In those instances, then, where a contribution is not made to a charity or is made to a charity for a particular individual, clearly there is that lack of "indefiniteness" in connection with the contribution that will result in its ineligibility as a charitable contribution under our tax laws. The unfettered control by a charity of a contribution is the hallmark of a charitable contribution because it brings in to play that element of indefiniteness essential to the contribution being deemed charitable; where the control over a contribution is restricted to a certain individual, then that essential element of indefiniteness is lacking.

---

**6.** The majority presents the primary benefit and control tests as alternative tests permitting the charitable deduction when the taxpayer can meet either test; however, the tests are far from equal as far as the taxpayer is concerned. A taxpayer who meets the majority's control test will be able to deduct all the money contributed, including money that is used to meet the third party's living expenses. Under the primary benefit test, however, the same taxpayer, because of the majority's application of the "away from home" requirement, will not be able to deduct the money used for the third party's living expenses. This anomalous result under the two tests further indicates the inappropriateness of the primary benefit test when the deductible expenses are incurred by a third party.

**7.** The majority opinion holds that in *Winn* a control test was applied but that the case stands for the principle that under the control test the charity need not have full control over the contribution. Maj. op. at 1330. This issue is addressed *infra* at 1340.

The majority acknowledges that control over donated funds to a charity means that the charity "is to have discretion as to their use." Maj. op. at 1334. This is the result when the charity has possession of the contribution without restriction as to use. *See Tripp v. Commissioner, supra.* The majority concludes, however, that discretionary possession by the charity of a contribution, and thus control of the contribution, is met where the charity solicits funds for a specific charitable purpose. The reasoning is that "[i]n these circumstances the charity has control and discretion because it has created a specific charitable cause and has solicited funds in support of the cause." Maj. op. at 1334. For support of this unique theory the majority relies upon our holding in *Winn*.

The majority concludes that the fact that an officer of the church had possession of the contribution was not crucial to the holding in *Winn* that the church had control. Thus, if it was not essential that the church have had possession in order for the church to have had control, then control can be established under other guidelines. I disagree. The language of *Winn* makes it quite clear that possession of the contribution in issue there by an official of the church, albeit the father of the individual who was the subject of the church's solicitation, is ·crucial to its holding that the church had control of the contribution:

> Proof that the church in Benoit sponsored "Sara Barry Days" for the express purpose of collecting funds for this part of its work, *that an officer of that church took the funds donated and dealt with them as the church wished,* and that the funds went to the support of

the work the church intended is sufficient to establish that the funds were donated for the use of the Benoit Presbyterian Church.

595 F.2d at 1065 (emphasis added).[8]

Relying on its conclusion that possession by the Church of the funds contributed by the Brinleys to their son was not essential in the control test equation, and rejecting also the Brinleys' argument that their missionary son is an agent of the Church and thus that the Church had control over their contributions to him, the majority proceeds to conclude that the essential element of control can be found based on two factors: (1) the Church had a world-wide missionary program and (2) it solicited funds in support of that program. Thus, reasons the majority, the Brinleys are entitled to a charitable deduction in this case if they can "match" their contribution to their son with a corresponding request from the Church. Such a holding simply ignores the basic thesis that a contribution made with the intent to favor a particular individual, whether earmarked in a contribution to a charity or made to the individual directly, lacks that indefiniteness that qualifies it as a charitable contribution. The contribution made by the Brinleys simply does not meet the eligibility requirements for deductibility under a proper application of the control test.

The more liberal control test sanctioned by the majority may also result in a hidden double deduction. The majority does not prohibit taxpayer parents from donating funds to their missionary child pursuant to the Church's directions and thereby obtaining a full deduction for the child's expenses and from also claiming a deduction for the child as a dependent because they are pro-

---

**8.** One student note has suggested that *Winn* was improperly decided. Note, *Does Charity Begin at Home? The Tax Status of a Payment to an Individual as a Charitable Deduction,* 83 Mich.L. Rev. 1428 (1985).

There is little, if any, difference between the church in *Winn* holding a special benefit event for Sara Barry and having her father accept a check from her cousin which he deposited into her personal bank account, and the church in *Brinley* writing a letter to Derry's parents requesting payment of his ex-

penses, which payment is then deposited directly into his personal bank account. In retrospect, the agency argument is no stronger in *Winn* than in the Mormon cases, and *Winn* was probably incorrectly decided, even though on its facts it is clear that in channeling money directly to Sara Barry without having to go through the church's bank account, deception of the church by the taxpayer was neither intended nor accomplished.

*Id.* at 1438 n. 57.

viding more than one-half of the child's support. Under a more strict version of the control test, this hidden deduction for a dependent child would not occur because the parents would first contribute to the Church, and the Church would then distribute the money to the child. The parents would not be able to take a deduction for the child being a dependent because the Church, and not the parents, is providing the child's support.

### IV.

The facts of the Brinleys' case and those of the taxpayers in *White* invoke a great deal of empathy for the taxpayers in their effort to qualify their payments to their missionary son as a charitable contribution; application of the control test to deny a deduction for these payments would appear harsh on these facts. However, the courts must be mindful that the law that they establish in one case may be applied in many other cases. I am convinced that the law established by the majority today will lead to abuse by other taxpayers in the future and result in an administrative burden on our tax collecting officials. As I am also of the opinion that the test adopted by the majority was not intended by the Congress and is not supported by the case law, I respectfully dissent.