165 Ill. App.3d 890 (1987)
520 N.E.2d 795
In re ESTATE OF ELIJAH MUHAMMAD, Deceased (Emmanuel Muhammad, Adm'r De Bonis Non, Petitioner and Intervenor and Appellee and Cross-Appellant,
v.
First Pacific Bank of Chicago, Respondent and Appellant and Cross-Appellee and Third-Party Plaintiff-Appellee and Cross-Appellant (The Nation of Islam et al., Third-Party Defendants-Appellants and Cross-Appellees; The People of the State of Illinois by Neil F. Hartigan, Attorney General, Intervenor-Appellant)).
Nos. 86-2876, 86-2877, 86-3147, 86-3216, 86-3349, 86-3350, 86-3359 cons.
Illinois Appellate Court  First District (4th Division).
Opinion filed December 31, 1987.
*891 Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Christine Hehmeyer Rosso, Floyd D. Perkins, and Matthew D. Shapiro, Assistant Attorneys General, of Chicago, of counsel), for the People.
Philip W. Tone, William D. Heinz, Melinda S. Levine, Jay R. Hoffman, Linda L. Listrom, and Ross B. Bricker, all of Jenner & Block, and Hoken S. Seki and Terrence J. Gaffney, both of Seki & Jarvis, both of Chicago, for First Pacific Bank of Chicago.
*892 Ernest H. Sharif, of Pittsburgh, Pennsylvania, for appellants Nation of Islam et al.
Rufus Cook, Barbara J. Revak, and Rochelle J. Brinnick, all of Cook Partners Law Offices, Ltd., of Chicago, for appellee Estate of Elijah Muhammad.
Reversed in part, vacated and dismissed in part.
JUSTICE JIGANTI delivered the opinion of the court:
This appeal involved a dispute over the ownership of approximately $3 million placed in a bank account entitled "The Honorable Elijah Muhammad's Poor Fund Account" (Poor Fund Account) at the First Pacific Bank of Chicago (Bank). Elijah Muhammad was the leader of a religious organization known as the Nation of Islam (Nation). He died in 1975 survived by a number of legitimate and illegitimate children (the Estate). Following Elijah Muhammad's death the Bank, believing that the Poor Fund Account belonged to the Nation, transferred the money to a new account opened by Wallace Muhammad, Elijah Muhammad's successor as leader of the Nation.
Several years after the transfer of funds, the Estate filed a citation proceeding against the Bank seeking to recover the funds under the theory of conversion. The Bank defended against the conversion action, alleging that the Nation was both the contractual and equitable owner of the funds. The Bank also filed a third-party claim against the Nation, maintaining that if the Bank was ultimately found liable to the Estate, the Nation was unjustly enriched by the transfer of funds. The trial court, sitting without a jury, entered judgment in favor of the Estate and against the Bank based upon its finding that Elijah Muhammad was the contractual owner of the Poor Fund Account and that the transfer of funds was unauthorized. The court also entered judgment in favor of the Bank and against the Nation on the third-party claim. On appeal this court reversed and remanded the cause for a new trial on the grounds that the trial court erred in refusing to consider evidence concerning the equitable ownership of the Poor Fund Account. (In re Estate of Muhammad (1984), 123 Ill. App.3d 756, 463 N.E.2d 732 (Muhammad I).) Although this court offered no opinion in Muhammad I as to the contractual ownership of the Poor Fund Account, we noted that the issues of equitable and contractual ownership were so closely intertwined that they should be considered together by the trial court after the presentation of all relevant evidence.
At the conclusion of the second trial, the trial court found that *893 Elijah Muhammad was the equitable owner, as well as the contractual owner, of the Poor Fund Account. Based upon this finding, judgments were once again entered in favor of the Estate on its conversion claim against the Bank and in favor of the Bank on its third-party claim against the Nation. Appeals from these judgments have been consolidated in this court.
The central issue in this appeal is whether the trial court was correct in determining that Elijah Muhammad's estate, rather than the Nation of Islam, was the equitable and contractual owner of the Poor Fund Account. However, because our determination as to the equitable ownership of the account is dispositive of this appeal, it will not be necessary for us to address the question of contractual ownership. Certain peripheral issues raised by the parties will be discussed later in this opinion.
 1, 2 As we stated in Muhammad I, the "true ownership of a deposit may be proved to be in another than the person in whose name it is made," and courts may use their equitable powers to determine the beneficial or equitable owner of an account. (In re Estate of Muhammad (1984), 123 Ill. App.3d 756, 759, 463 N.E.2d 732, 735, citing 5 Michie, Banks and Banking § 79, at 217 (1950).) The right of an owner to money belonging to him is not defeated by the fact that it is deposited in the name of another. (Nurrie v. Fitzgerald (1923), 222 Mich. 327, 331, 192 N.W. 573, 575.) Generally, the relationship between the depositor and the bank is one of creditor and debtor, with the bank liable to the depositor for the amount of the deposit. (Katz v. Belmont National Bank (1986), 112 Ill.2d 64, 68, 491 N.E.2d 1157, 1159.) However, under circumstances where a "claim is made by a third person who is in fact the true owner of the deposit, the bank is justified in making payment to him." (10 Am.Jur.2d Banks § 506, at 474 (1963).) In making payment to a person other than the depositor, the bank acts at its peril and is liable to the depositor if the claim is not valid. 10 Am.Jur.2d Banks § 506, at 474 (1963).
 3 The Estate disputes these principles of law, contending that equitable ownership is no longer significant in light of the Illinois Supreme Court decision in Katz v. Belmont National Bank (1986), 112 Ill.2d 64, 491 N.E.2d 1157. The Katz court held that the equitable owner of a bank account cannot maintain a conversion action against the bank based upon the bank's payment to the contractual owner of the account. The court recognized, however, that the equitable owners did have a remedy against the contractual owner. The case at bar is clearly distinguishable from the Katz decision. Here, the Bank is attempting to assert its payment to the equitable owners as a defense *894 to a conversion action filed by the contractual owners.[1] We find nothing in the Katz decision which would preclude the Bank from doing so. We therefore conclude that if the Nation was in fact the equitable owner of the Poor Fund Account, the Bank's transfer of funds to the Nation would serve as a valid defense to the claim of conversion raised by the Estate.
Because we have determined that the issue of equitable ownership is the focal point of this appeal, we will summarize only those facts bearing upon the issue of equitable ownership. The evidence presented to the trial court regarding equitable ownership was, to say the least, voluminous. It included the testimony of 13 witnesses covering approximately 1,500 pages of the transcript and the introduction into evidence of 22 documents and exhibits. Two important facts were undisputed at trial. First, the parties stipulated that donations from members of the Nation (hereinafter referred to as believers) constituted an overwhelming portion of the money deposited into the Poor Fund Account. Second, it was undisputed that Elijah Muhammad exercised complete discretion over the Poor Fund Account during his lifetime and spent much of it on himself and the members of his family. Evidence presented by the Estate showed that the believers considered the financial empowerment of their leader essential to the Nation's goal of "uplifting the black man in America."
Upon joining the Nation, believers were given a brochure entitled "Your Orientation Brochure," which served as a general introduction to the tenets of the organization. A section of the brochure labeled "Charity Discussion" is of particular significance to the resolution of this appeal. This section begins with a general statement of the central role occupied by charity in the Islamic religion. It then lists three "treasuries" to which the believers were asked to contribute. These treasuries are the "Number 2 Poor," the "Central Point," and the "Saviour's Day Gift." The donations earmarked for the Number 2 Poor treasury were deposited into the Poor Fund Account, which was described as follows:
"No. 2 Poor: This treasury is for the use of our leader and teacher. With it the Honorable Elijah Muhammad sees to it that the poor and needy of our nation are looked after. This treasury is also designed to see to it that our leader and *895 teacher himself and his family want for nothing. The generosity of our leader and teacher himself is so well known that stories are told about his gifts throughout the Nation. For a man who has given his very soul and health to see to it that his people hear the truth, we can not give too much."
Enclosed with the brochure was a "charity slip" which the believer would use to designate the treasury which was to receive his donation. The brochure then stated that the charity slip "is actually a receipt for whatever monies you contribute to the growth of your chosen religion and it is income tax deductible. You should therefore save these slips to substantiate your deductions." A document distributed to the ministers of the individual mosques described the Number 2 Poor treasury as "the treasury we use to donate to the Messenger of Allah."
Pursuant to the instructions contained in the orientation brochure, believers would make donations in the form of checks or cash at the religious services. Ministers from the individual mosques would then take the cash and checks to local banks at which they had accounts and would obtain a separate cashier's check for each treasury.
The testimony of witnesses bearing on the issue of equitable ownership was conflicting. The Bank's witnesses testified that Elijah Muhammad referred to himself as the "caretaker" of the money which he held and stated that it was "not my money. I do not have any money. This is money that was entrusted to me by the Nation of Islam." The trial court, in assessing the credibility of the witnesses, rejected the testimony of the Bank's witnesses on the basis that their views were affected by the fact that they were followers of Wallace Muhammad, the new leader of the Nation. The Estate's witnesses testified that Elijah Muhammad considered the Poor Fund Account as belonging to him personally and stated that he opened the Poor Fund Account to keep his money separate from that of the Nation. These witnesses further testified that Elijah Muhammad made "loans" to Temple No. 2, the Nation's incorporated entity, using money from the Poor Fund Account, and that he expected the loans to be repaid. As previously stated, however, it was undisputed that donations from believers constituted the ultimate source of the money in the Poor Fund Account.
 4, 5 As we stated in Muhammad I, evidence relevant to the issue of equitable ownership may include facts surrounding the creation and history of the account as well as facts reflecting the intent of the depositor and the source of the funds. (In re Estate of Muhammad (1984), 123 Ill. App.3d 756, 759, 463 N.E.2d 732, 735.) While the *896 credibility of the witnesses is a question of fact to be decided by the trier of fact (Nemeth v. Banhalmi (1984), 125 Ill. App.3d 938, 962, 466 N.E.2d 977, 994), the meaning to be given to the plain words of a written instrument is a matter of law to be decided by the court (Ahlvers v. Terminal R.R. Association (1975), 31 Ill. App.3d 166, 171-72, 334 N.E.2d 329, 334). With these principles in mind, we will turn now to the question of whether the trial court was correct in determining that Elijah Muhammad personally, rather than the Nation, was the equitable owner of the Poor Fund Account.
The Estate places much emphasis on the fact that the trial court rejected the testimony of the Bank's witnesses as not credible and accepted the testimony of the Estate's witnesses. As discussed earlier, the witnesses for the Estate testified that Elijah Muhammad considered the money in the Poor Fund Account to belong to him personally, that he intended to keep it separate from money belonging to the Nation, and that he "loaned" money from the Poor Fund Account to the Nation expecting it to be repaid. However, because it is undisputed that donations from believers constituted the source of these funds, we view the critical question as what expressions of intent were evident at the time the donations were solicited and made. It appears that the most significant evidence on this point is the document entitled "Your Orientation Brochure."
 6 As stated earlier, the orientation brochure contained a general discussion of the importance of charity, then listed certain treasuries to which believers were asked to contribute. The Number 2 Poor treasury was described as being for the "use" of Elijah Muhammad, and the brochure represented that "[w]ith it the Honorable Elijah Muhammad sees to it that the poor and needy of our Nation are looked after." We believe that the clear import of this wording is that the donations which were being solicited were to be used by Elijah Muhammad for a charitable purpose, i.e., the care of the poor and needy members of the Nation. A charitable purpose has been broadly defined to include almost anything that tends to promote the improvement or well being of social man. (People ex rel. Hartigan v. National Anti-Drug Coalition (1984), 124 Ill. App.3d 269, 274, 464 N.E.2d 690, 694.) The trial court apparently overlooked this expression of charitable intent and focused on the next sentence, which stated, "This treasury is also designed to see to it that our leader and teacher himself and his family want for nothing." The court concluded from this language that the donations to the Number 2 Poor treasury were intended to be personal gifts to Elijah Muhammad.
 7, 8 We believe this conclusion was erroneous for two reasons. *897 First, the trial court erred in overlooking language indicating the primary purpose of the treasury, the care of the poor and needy of the Nation, in favor of language in the next sentence indicating what we believe is properly interpreted as a secondary purpose. Second, the fact that the money was "also" to be used to provide for Elijah Muhammad and his family does not necessarily lead to the conclusion that the money constituted a personal gift rather than a donation for religious or charitable purposes. Funds donated for the use of an individual involved in religious work may be considered donations to the religious organization. (Winn v. Commissioner of Internal Revenue (5th Cir.1979), 595 F.2d 1060, 1065.) The rationale supporting this proposition is that such donations make it possible for the individual to devote his time and efforts to the work of the religious organization without having to worry about supporting himself and his family. (Morey v. Riddell (S.D. Cal. 1962), 205 F. Supp. 918, 921.) Thus, we interpret the brochure's description of the Number 2 Poor treasury as a representation to the believers that their donations would be used to benefit the Nation, both by providing for the poor and needy and by providing for the Nation's leader and his family.
Perhaps the most convincing evidence on the issue of whether donations to the Number 2 Poor treasury were intended as personal gifts to Elijah Muhammad or as funds for the benefit of the Nation is contained in the orientation brochure's representations regarding tax deductibility. The brochure informed the believers that contributions to all of the treasuries, including the Number 2 Poor treasury were "income tax deductible" and that they should retain their charity slips as receipts to substantiate their tax deductions. It is well established that contributions to an individual, "no matter how worthy," do not qualify for a charitable deduction. (Tripp v. Commissioner of Internal Revenue (7th Cir.1964), 337 F.2d 432, 436.) As noted above, however, contributions to religious leaders for their support are considered contributions for the benefit of the religious organization and may qualify for a charitable deduction. (Brinley v. Commissioner of Internal Revenue (5th Cir.1986), 782 F.2d 1326.) It appears clear then that the solicitations were made with the intent of using the funds to benefit the Nation rather than to bestow personal gifts upon Elijah Muhammad.
Finally, as we stated in Muhammad I, the intent of the depositor of a bank account is relevant in determining equitable ownership. The very title of the account in question, "The Honorable Elijah Muhammad's Poor Fund Account," demonstrates that he intended the funds in the account to benefit the poor of the Nation.
 9, 10 Based upon the foregoing analysis, we conclude that the *898 funds in the Poor Fund Account were solicited upon the representation that the money would be used to benefit the Nation and that the believers, in making donations, intended their money to be used for that purpose. Under these circumstances, the trial court erred in determining that Elijah Muhammad was the equitable owner of the Poor Fund Account and the Estate would be unjustly enriched if allowed to retain these funds. A court will use its equitable powers to impose a constructive trust where a person holding property would be unjustly enriched if permitted to retain the property. (A.T. Kearney, Inc. v. INCA International, Inc. (1985), 132 Ill. App.3d 655, 660, 477 N.E.2d 1326, 1332.) As stated in Roth v. Carlyle Real Estate Limited Partnership VII (1984), 129 Ill. App.3d 433, 438, 472 N.E.2d 836, 840, "Illinois law holds that a constructive trust may be imposed when so required by equity and good conscience; the presence of fraud is not controlling." Where funds are solicited to benefit a religious organization, we believe that basic principles of equity and fair dealing should preclude the use of those funds to benefit the personal estate of the religious leader.
The parties have raised a number of additional and peripheral issues, including claims of estoppel, breach of contract, awards of pre-judgment interest and certain third-party claims. Our disposition of this cause on the basis of equitable ownership makes consideration of these issues unnecessary.
Accordingly, the judgment in favor of the Estate and against the Bank is reversed. The judgment in favor of the Bank against the Nation on the third-party claim is vacated and the claim is dismissed as moot.
Reversed in part; vacated and dismissed in part.
McMORROW, P.J., and LINN, J., concur.
NOTES
[1] In Muhammad I, we expressed no opinion as to the correctness of the trial court's finding that the Estate was the contractual owner of the Poor Fund Account. We will assume, for purposes of this appeal, that the Estate was in fact the contractual owner.